STATE OF WISCONSIN
DEPARTMENT OF WORKFORCE DEVELOPMENT
EQUAL RIGHTS DIVISION

COPY

PAM PALZKILL,

    Complainant,

    vs.

CURT MANUFACTURING, INC.,

    Respondent.

DEPOSITION
ERD Case No.
CR201202146

The deposition of TIMOTHY HAU, taken under and pursuant to the provisions of Chapter 804 of the Wisconsin Statutes and the acts amendatory thereof and supplementary thereto, before Stephanie J. Peil, Notary Public in and for the State of Wisconsin, Bakke Norman, S.C., 2919 Schneider Avenue, Menomonie, Wisconsin, on the 15th day of November, 2013, commencing at approximately 9:00 a.m.

ORIGINAL TRANSCRIPT FILED AT THE
OFFICES OF ATTORNEY PETER M. REINHARDT

---

APPEARANCES:

    Peter M. Reinhardt, Esq., of Bakke Norman, S.C., 2919 Schneider Avenue, Menomonie, Wisconsin, 54751, appeared representing the complainant.

    Mark Johnson, Esq., of Krukowski & Costello, S.C., 1243 N. 10th Street, Suite 250, Milwaukee, Wisconsin, 53205, appeared representing the Respondent.

    Also present: Kim Myers.

EXAMINATION INDEX

TIMOTHY HAU:

By Mr. Reinhardt      3
By Mr. Johnson      121

EXHIBITS

| Marked for Identification | Page |
|---|---|
| 1 - CareerBuilder, Wisconsin Job Board Listing | 14 |
| 2 - Job Order History Download | 16 |
| 3 - Master Consulting Services Agreement | 17 |
| 4 - Programmer Job Description | 24 |
| 5 - Programmer/Analyst Job Description | 26 |
| 6 - Emails | 100 |
| 7 - Emails | 101 |
| 8 - Emails | 102 |
| 9 - Email | 104 |
| 10 - Mr. Hau's Timeline of Events | 105 |
| 11 - Krukowski & Costello Letter to EEOC | 112 |
| 12 - Krukowski & Costello Letter to DWD | 116 |
| 13 - First Set of Interrogatories | 116 |
| 14 - IT 2012 Operating Budget | 117 |

ORIGINAL EXHIBITS WITH ORIGINAL TRANSCRIPT
COPIES SUPPLIED TO THE ATTORNEYS

---

P R O C E E D I N G S

TIMOTHY HAU,

being first duly sworn, testified as follows:

EXAMINATION

BY MR. REINHARDT:

Q.  Please state your name for the record.

A.  Timothy John Hau.

Q.  Mr. Hau, what is your home address?

A.  S7930 Jamie Lane, Eau Claire, Wisconsin.

Q.  Let me briefly go over the deposition rules for what's going to go on today. I have four, I think. First is I'm going to be asking you questions. It's important to me that you understand the questions. So for some reason if you don't understand a question, please let me know, and I will —

A.  I'm going to switch chairs. I'm sorry. I'm listening.

Q.  Let me restart. I think we were talking about that I'm going to be asking you questions, and it's important to me that you understand the question. If you don't understand the question, let me know, and I will restate or rephrase the question. Do you understand that?

A.  I do.

---

Q.  If for some reason — strike that. If you go ahead and answer the question, I'm going to assume that you understood the question. Do you understand that?

A.  I do.

Q.  Second, as you can see, the court reporter is taking down everything I say and everything you say. She can't take us — she can't take us both talking at the same time down, so I'd ask that you let me finish my question before you go onto your answer. Do you understand that?

A.  I do.

Q.  Third, the court reporter —

A.  You'll tell me when you're finished.

Q.  Well, I'm not going to — the answer is no, I'm not going to tell you when I'm finished. Just take a pause and make sure I'm finished. If I'm not finished, I will let you know.

A.  Okay.

Q.  Third, the court reporter can't take down a nod of the head or a gesture of the hand, so I ask that you articulate an answer and avoid huh-uh or um-hum because they look the same on the record. All right?

A.  Agreed.

1    Q.   Fourth, I anticipate your deposition will take
2        approximately three hours today. We'll take a
3        break sometime after an hour or so. But if in
4        the interim you need to take a break to use the
5        restroom, get up and stretch, for whatever
6        reason, let me know, and I will accommodate
7        your request provided that your request does
8        not fall in the middle of a line of
9        questioning.
10        So with that said, have you reviewed
11        anything in order to prepare for your
12        deposition today?
13    A.   Some of the material that has been provided to
14        me as far as the court orders, yes.
15    Q.   What specific material do you recall reviewing?
16    A.   I opened the document that said I should be
17        here at nine, and I got the address off of it.
18    Q.   Anything else?
19    A.   I've looked at some of the notes that have been
20        produced, my document that I created.
21    Q.   Anything else?
22    A.   I think that's about it.
23    Q.   Did you look at the position statement that was
24        prepared by CURT Manufacturing and provided to
25        the EEOC and the Equal Rights Division for the

1        State of Wisconsin?
2    A.   I don't know what that document is.
3    Q.   Did you look at CURT Manufacturing's discovery
4        responses?
5    A.   Did I look at CURT Manufacturing's discovery?
6        If I can see the document, I could tell you.
7        I'm not sure by name of document. I don't know
8        what you're referencing. So if I could see it,
9        I could answer that.
10    Q.   Fair enough. We'll get to that. Are you
11        currently employed, sir?
12    A.   Yes.
13    Q.   By whom are you employed?
14    A.   CURT Manufacturing, LLC.
15    Q.   And what is your title today?
16    A.   Chief information officer.
17    Q.   For how long have you held that title?
18    A.   Two years. I'm not sure.
19    Q.   For how long have you been employed by CURT
20        Manufacturing?
21    A.   Three-and-a-half years.
22    Q.   What was your start date?
23    A.   It was in July of 2010.
24    Q.   By whom were you employed prior to July of
25        2010?

1    A.   Dedicated Computing, LLC.
2    Q.   When you started at CURT Manufacturing in July
3        of 2010, what was your title at that point?
4    A.   Director of information technology.
5    Q.   And so is it fair to say that it would have
6        been July of 2012 that you became the chief
7        information officer?
8    A.   I don't know the dates. I'd have to go to the
9        HR department to find out the date.
10    Q.   It was approximately two years ago that you
11        became the —
12    A.   That's my current guess, yes.
13    Q.   And what were your duties and responsibilities
14        generally as director of information technology
15        for CURT Manufacturing?
16    A.   I was responsible for all the systems, the
17        business systems, and the development of the IT
18        department.
19    Q.   When you say you were responsible for all the
20        business systems, what does that mean?
21    A.   You could put that in the category of ERP
22        systems of any cross-functional tools,
23        electronic tools, software, that the business
24        uses.
25    Q.   Who did you report to when you were the

1        director of information technology?
2    A.   Bob Roemer. Robert I guess is his official
3        name.
4    Q.   What was his position?
5    A.   Chief financial officer.
6    Q.   And who reported to you when you were the
7        director of information technology?
8    A.   Everyone in the IT department did.
9    Q.   They were your direct reports?
10    A.   Yes.
11    Q.   Where is CURT Manufacturing located?
12    A.   6208 Industrial Drive, Eau Claire, Wisconsin.
13    Q.   Is that its only location?
14    A.   No. There's 11 locations — 10 now.
15    Q.   Where is —
16    A.   It just closed.
17    Q.   And you indicated CURT Manufacturing is an LLC
18        at this time?
19    A.   Yes.
20    Q.   Was it an LLC back in 2011/2012?
21    A.   Yes.
22    Q.   Where is its principal place of business?
23    A.   6208 Industrial Drive, Eau Claire, Wisconsin.
24    Q.   You said there are 10 or 11 other locations?
25    A.   Yes.

1 Q. Do you know where those are? Are they in
2   Wisconsin?
3 A. None of the others are in Wisconsin, no.
4 Q. What is CURT Manufacturing in the business of
5   doing?
6 A. We're a custom hitch manufacturing company, and
7   we supply hitches to the -- hitches and hitch
8   accessories to the towing industry.
9 Q. And you said those are manufactured by CURT?
10 A. The hitches are manufactured by CURT. We have
11   other product that is not.
12 Q. Back in 2011 do you know how many employees
13   CURT Manufacturing had?
14 A. No, I don't know the number.
15 Q. Is it more than 100?
16 A. Yes.
17 Q. More than 200?
18 A. Likely, yes.
19 Q. More than 300?
20 A. I don't know. You're getting in the range now
21   where I'm not sure.
22 Q. Who would know that?
23 A. The HR department.
24 Q. In 2011 did you know that it was contrary to
25   state and federal law to discriminate against

1   somebody who has a disability?
2 A. Did I know specifically? To the way you worded
3   that question, no, I didn't know that. I knew
4   in general you don't do things like that. But
5   your specific question, no, I didn't know that.
6 Q. In 2011 did you know what the Wisconsin Fair
7   Employment Act was?
8 A. I was aware that existed. I did not know what
9   it was.
10 Q. How were you aware that it existed?
11 A. Through my career.
12 Q. 2011, did you know what the Americans with
13   Disabilities Act was?
14 A. I knew it existed. I did not know the details
15   of that.
16 Q. Did you know generally that the law stated you
17   cannot discriminate against somebody in the
18   terms and conditions of employment because of a
19   disability?
20 A. That was -- that would have been my assumption,
21   yes.
22 Q. You can't discriminate against somebody in
23   hiring them because they have a disability?
24 A. That would have been my assumption, yes.
25 Q. When you say "your assumption," what do you

1   mean by that?
2 A. I've never read the act.
3 Q. Have you had any training as of 2011 or 2012
4   with respect to the Wisconsin Fair Employment
5   Act or the Americans with Disabilities Act?
6 A. No, I have not.
7 Q. You're a college graduate?
8 A. Yes, I am.
9 Q. Where did you graduate from?
10 A. University of Wisconsin-Madison.
11 Q. What year?
12 A. I think it was '85, 1985.
13 Q. What was your degree in?
14 A. Computer science, and then I have an MBA from
15   Edgewood College.
16 Q. In Madison?
17 A. Yes.
18 Q. What's your MBA in?
19 A. Finance.
20 Q. And prior to coming to CURT Manufacturing, was
21   it Dedicated Computing? Is that what you said?
22 A. Yes.
23 Q. What was your position there?
24 A. Director of information technology.
25 Q. How long were you there for?

1 A. Four years.
2 Q. And before that?
3 A. Before that, Escape Key Technologies.
4 Q. What did you do there?
5 A. I was the founder of Escape Key Technologies.
6   I provided interim CIO services to small and
7   medium size companies.
8 Q. In 2011 did CURT Manufacturing have some need
9   for programmer/analysts at its Eau Claire
10   location?
11 A. We sure did.
12 Q. And why was it that CURT Manufacturing had a
13   need at that time?
14 A. The business requirements required us to make
15   changes to our environment.
16 Q. Could you be more specific, please. What about
17   the business environment required you to make
18   changes?
19 A. The growth of our company was requiring us to
20   become more scalable as far as our systems were
21   concerned. There were too many people with
22   problems doing day-to-day tasks. Our systems
23   were unstable, they weren't predictable, and
24   they caused a lot of problems for anyone that
25   worked with them.

1  Q.  And was it your responsibility to find more
2      people to work as programmer/analysts in 2011?
3  A.  It was my responsibility to fix all the
4      problems that existed. It wasn't necessarily
5      dictated to me, Hire people.
6  Q.  As part of your responsibility to fix the
7      problems, did you determine that more
8      programmer/analysts were needed?
9  A.  Yes, I did.
10  Q.  What, if anything, did you do to get more
11      programmer/analysts?
12  A.  We posted positions on the Internet, we talked
13      to recruiters, we posted positions on our
14      website, we posted positions internally, we
15      posted positions pretty much everywhere you can
16      post positions.
17  Q.  When you say "we," who are you referring to?
18  A.  CURT Manufacturing.
19  Q.  I understand that. But what specific
20      individuals at CURT Manufacturing actually
21      participated in these postings?
22  A.  The HR department.
23  Q.  Did you have any role at all in coming up with
24      the information that was posted at these
25      various locations in terms of what was needed?

1  A.  Some.
2        (Exhibit No. 1 was marked for
3      identification.)
4  BY MR. REINHARDT:
5  Q.  Showing you what's been marked for
6      identification as Hau Deposition Exhibit No. 1.
7      Please take a moment and look at the document,
8      and let me know when you've reviewed it
9      sufficiently to be able to answer some
10      questions.
11  A.  Okay. I'm ready.
12  Q.  First of all, do you know what Hau Deposition
13      Exhibit No. 1 is?
14  A.  Do I know how it is?
15  Q.  Do you know what it is.
16  A.  Based on the handwriting, it appears to be a
17      posting from CareerBuilder, Wisconsin Job
18      Board. That would be my assumption.
19  Q.  Is this a posting that occurred in 2011?
20  A.  I don't know.
21  Q.  Would you look at the bottom of the page, four
22      lines up. There is a bullet point I will call
23      it, for lack of a better description, which
24      states, Minimum of three years experience with
25      AS/400, RPG, and CL. Do you see that?

1  A.  I do.
2  Q.  Is that what you as the — I want to make sure
3      I get your title right — director of
4      information technology were looking for in 2011
5      in terms of minimum experience for a
6      programmer/analyst position?
7  A.  That was one of them, yes.
8  Q.  What is AS/400?
9  A.  That's commonly referred to as the hardware
10      platform that our business system runs on.
11  Q.  When you say "your business system," what are
12      you referring to?
13  A.  Today it's called XA. In the past it's been
14      referred to as MAPICS, PowerLink, Browser, all
15      kinds of different names.
16  Q.  What is RPG?
17  A.  Report — I'm guessing here. Report Program
18      Generator I think is what it stands for.
19  Q.  It's a programming language?
20  A.  Is that a question?
21  Q.  Yes.
22  A.  Yes, it's a programming language.
23  Q.  In other words, it's a language in which source
24      code is written?
25  A.  Yes.

1  Q.  What is CL?
2  A.  Control Language.
3  Q.  Is that a programming language also?
4  A.  Yes, it is.
5        (Exhibit No. 2 was marked for
6      identification.)
7  BY MR. REINHARDT:
8  Q.  Showing you what's been marked for
9      identification as Hau Deposition Exhibit 2.
10      Again, take a moment to look at this document,
11      and let me know when you're able to answer
12      questions about it.
13  A.  Okay. I'm ready.
14  Q.  Do you know what this document is?
15  A.  I have no idea.
16  Q.  Fair enough. Did CURT Manufacturing have a
17      contract with Omni Services in 2011?
18  A.  We had a — did we have a contract? When we
19      contracted for Pam and we contracted for Kathy,
20      yes, we did.
21  Q.  Let me ask you this. To your knowledge, when
22      is the first time that CURT Manufacturing
23      entered into any contractual relationship with
24      Omni Resources, Inc.?
25  A.  There's been a number of contractors that have

1    come through there, so I don't know if Kathy

2    was the first one, but I'll go with Kathy.

3  Q.  Well, were you involved in arranging with Omni

4    Resources, Inc., to provide services for CURT

5    Manufacturing?

6  A.  Yes, I was.

7  Q.  And were they signed up as of the time you

8    started in July of 2010, or is that something

9    that you worked on getting together?

10  A.  I don't understand "signed up."

11  Q.  Well, was the contract signed with Omni

12    Resources, Inc., as of the time that you

13    started with CURT Manufacturing?

14  A.  I don't — I wasn't aware of one, if there

15    were, if there was a contract. I'm sure there

16    wasn't an open contract.

17  Q.  Say that again. I'm sorry.

18  A.  I'm sure there wasn't an open contract.

19    Contracts go for a term where you say, okay,

20    here's how many months you want this resource,

21    and then they end.

22  Q.  Did you sign any contracts on behalf of CURT

23    Manufacturing with Omni Resources, Inc.?

24  A.  Yes, I did. Many.

25       (Exhibit No. 3 was marked for

1    identification.)

2  BY MR. REINHARDT:

3  Q.  Showing you what's been marked for

4    identification as Hau Deposition Exhibit No. 3.

5    Have you seen this document before?

6  A.  I can't say that this is the one I've seen, but

7    I've seen a Master Consulting Agreement with

8    Omni Resources that I've signed and they've

9    countersigned it. I don't see my signature on

10    this one, so I don't know that this is

11    specifically the one I've seen.

12  Q.  Have you provided or has anybody on your behalf

13    provided a Master Consulting Services Agreement

14    with your signature to your counsel?

15  A.  I believe I did, yeah.

16       MR. REINHARDT: Mark, I have not seen this

17    document with the signature on it. Do you know

18    if you provided it?

19       MR. JOHNSON: I've provided everything we

20    have. I thought I saw one, but I'd have to go

21    back and look.

22       MR. REINHARDT: I'll check. I'm not

23    saying you didn't. I went through the

24    documents. I didn't see it, but I'll go

25    through again, and then I'll just let you know

1    if I don't have it and just ask for it. I

2    assume it's not going to be a big deal.

3       MR. JOHNSON: No.

4  BY MR. REINHARDT:

5  Q.  What was your understanding, Mr. Hau, of what

6    the Master Consulting Agreement was intended to

7    accomplish?

8  A.  Provided me the right to use a resource that

9    was employed by Omni Resources as a contractor

10    to do some work over a specified period of

11    time. In addition to that — I'm trying to

12    find it on here because I know the one that I

13    signed there's some of this verbiage crossed

14    off and changed — that it allowed me to hire

15    that person after a period of time.

16  Q.  Was that important to you?

17  A.  It was one of the options I was pursuing, yes.

18  Q.  And why did you want to pursue that option?

19  A.  Because I had open positions for

20    programmer/analysts.

21  Q.  Did you feel at the time you signed the

22    contract with Omni Resources that there would

23    be some benefit to having programmer/analysts

24    as employees versus having them provide it on a

25    contract basis through Omni Resources?

1  A.  My goal was to hire people.

2  Q.  Why was that?

3  A.  Because contractors are much more expensive

4    than hiring.

5  Q.  Even when you take into account fringe

6    benefits?

7  A.  Even when I take into account — my experience

8    is contractors are more expensive for a long

9    term, as in years. When I look to hire

10    someone, I'm looking for a three-year minimum

11    as far as the duration of them. And when I go

12    at an hourly rate for a contractor, then it

13    becomes very high-priced.

14  Q.  Cost prohibitive?

15  A.  Yes.

16  Q.  With respect to the various contract employees

17    that were provided to CURT Manufacturing

18    through Omni Resources, was there a separate

19    agreement signed by and between CURT and Omni

20    for each of those employees?

21  A.  I missed the first part of what you said. Can

22    you repeat it?

23  Q.  With respect to each employee that was provided

24    to CURT Manufacturing on a contract basis

25    through Omni Resources —

1    A.   With each Omni employee?

2    Q.   Yes.

3    A.   Yes, a different contract was signed for each

4         Omni employee.

5    Q.   Between CURT and Omni?

6    A.   Yes.

7    Q.   What's your recollection —

8    A.   That's different. I'm sorry.

9              MR. JOHNSON: Just answer the question.

10   BY MR. REINHARDT:

11   Q.   The contract that's signed for each employee is

12        different than the Master Consulting Services;

13        correct?

14   A.   Yes.

15   Q.   That's what you were going to say?

16   A.   Yes.

17   Q.   What was your understanding in 2011 of what

18        CURT's right was in terms of hiring employees

19        that had been provided on a contractor basis

20        through Omni Resources? Did you understand

21        that you could do that at any time, or what was

22        your understanding?

23   A.   The contract that I had set up where I had

24        crossed off some of the verbiage was that after

25        six months I could hire them, and there

1         wouldn't be a placement fee associated with

2         that.

3    Q.   Was it six months, or was it a number of hours?

4    A.   I'd have to look at the contract that I signed,

5         but I think I hand wrote "six months."

6    Q.   Did you understand why — not why. I've seen a

7         reference in some documents to 1,000 hours

8         versus a six-month time period. That's why I

9         asked the question. But you believe it was six

10        months, not 1,000 hours?

11   A.   I believe the contract read that way, yes.

12   Q.   Was there some verbal agreement at some point

13        between you — I'm sorry. Was there some

14        verbal agreement or modification at some point

15        between CURT Manufacturing and Omni Resources

16        where it changed from six months to 1,000

17        hours?

18   A.   I'm not aware of any verbal agreement.

19   Q.   How about any modification of the written

20        agreement?

21   A.   I'm not aware of any modification to the

22        written agreement.

23   Q.   In 2011 and 2012 did CURT Manufacturing have a

24        specific job title that was named or labeled

25        "programmer"?

1    A.   Trying to think of how to answer that. Did I

2         have one would be different than did CURT

3         Manufacturing have one.

4    Q.   Let me ask it this way. We can go at it a

5         number of ways. As director of information

6         technology, was it one of your responsibilities

7         to make sure that there were job descriptions

8         in place for the various people under your

9         supervision?

10   A.   Yes.

11   Q.   Were there written job descriptions in 2011 for

12        the programmer and programmer/analyst position?

13   A.   I'm aware of a programmer/analyst position job

14        description. I'm not aware of a programmer.

15        That doesn't mean it didn't exist.

16   Q.   Do you know who would have maintained custody

17        of the job descriptions?

18   A.   The HR department.

19   Q.   Did you have access to those job descriptions?

20   A.   If I asked for them, I could get them, yes.

21   Q.   Could you get them on your computer, or did you

22        have to ask somebody for them?

23   A.   I had to ask for them.

24   Q.   And who was in charge of the HR department in

25        2011?

1    A.   Kim Myers.

2    Q.   Who was in charge of the HR department in 2012?

3    A.   Kim Myers.

4              (Exhibit No. 4 was marked for

5         identification.)

6    BY MR. REINHARDT:

7    Q.   Showing you what's been marked for

8         identification as Hau Deposition Exhibit 4.

9         Have you ever seen this document before?

10   A.   Yes.

11   Q.   What is this document?

12   A.   This is a job description for the title

13        Programmer.

14   Q.   And was this the job description that was in

15        effect for the programmer position at CURT

16        Manufacturing in 2011 and 2012?

17   A.   This appears to be a job description for a

18        programmer, but that doesn't mean I had an open

19        position for a programmer.

20   Q.   That wasn't my question. I understand — I'm

21        not asking if you had an open position. I'm

22        asking you if this was the job description in

23        effect during 2011 and 2012 for people employed

24        in the programmer position.

25   A.   I did not have anyone employed in the

programmer position.
Q. Aside from the fact that you didn't have anyone employed, if you did have somebody employed, was this the job description that was in effect?
A. I'll go with that. I mean, I'm not sure. I don't know how to answer because I didn't have a position for programmer. Did this job description exist? It sure looks like it did.
Q. Did you have any input into this job description?
A. I believe I created it.
Q. Do you know when you would have created it?
A. In — highly likely when I first started with the company.
Q. Are you telling me that during 2011 the IT department at CURT Manufacturing in Eau Claire did not have a programmer position employed?
A. To the best of my knowledge, I did not have — the IT department at CURT Manufacturing did not have a programmer employed.
Q. What about in 2012?
A. To the best of my knowledge, we did not.
Q. And in your mind how do you distinguish, if at all, the difference between somebody being

employed as a programmer and somebody being employed as a programmer/analyst?
A. When I come into a company and look at the department and the progression of employees within that department, I create something called a line of progression. And the line of progression for this type of position starts with programmer, then moves to programmer/analyst, then senior programmer/analyst.
Q. What is it that occurs in the line of progression that allows somebody to go from a programmer to a programmer/analyst?
A. Typically a programmer would be an entry-level person coming out of college. Sometimes the skill set of those entry-level people will dictate differences.
(Exhibit No. 5 was marked for identification.)
BY MR. REINHARDT:
Q. Showing you what's been marked for identification as Hau Deposition Exhibit No. 5. Tell me what this document is.
A. It's a job description for programmer/analyst at CURT Manufacturing dated 4/5/12.

Q. Is this a job description you prepared?
A. It appears to be, yes.
Q. And if you look at the second page, there is an entry called Preferred. Do you see that?
A. Yes, I do.
Q. And under that, one of the points is Knowledge of MAPICS XA ERP system. What is that referring to?
A. The MAPICS XA ERP system.
Q. Which is what?
A. It's the MAPICS XA ERP system that we talked about earlier.
Q. Sure. You have to understand, sir, that I'm not a computer programmer, so I have a very basic level of knowledge about computer programming. So I'm going to ask you to explain because you've thrown around the words "MAPICS," "PowerLink," "RPG." So let me ask you this. Does the — MAPICS XA ERP system, is that what is used to run the warehouse management system?
A. No, it is not.
Q. What is it used for?
A. It's our business system, and it includes inventory, customer orders, engineering,

manufacturing, and maybe some others. I don't know.
Q. And in 2011 and 2012 CURT Manufacturing had a warehouse management system; is that correct?
A. I would never call it a warehouse management system.
Q. What would you call it?
A. We had some homegrown software that allowed us to pick, pack, and then it was — that's it. It allowed us to pick and pack and keep track of the location of our inventory.
Q. What was that written in?
A. RPG and the various flavors of RPG and CL and SQL.
Q. The next entry says Experience with AS/400. Do you see that?
A. Yes.
Q. And is AS/400 your business system?
A. Again, you asked this earlier, the AS/400 is commonly referred to as the piece of hardware that our business system runs on.
Q. Why didn't you include in this Preferred any reference to PowerLink?
A. Because I didn't want to stop anyone from applying for this position that didn't have

1    PowerLink. That's a skill that I believe
2    people can be trained in.
3 Q. Is PowerLink a programming language?
4 A. It is a type of programming language, yes.
5 Q. So source code is written in PowerLink?
6 A. Actually, I don't know PowerLink well enough to
7    answer that question. I don't know if there's
8    source code that's visible.
9 Q. How is PowerLink used in your business?
10 A. It's the key programming language for our
11    business systems.
12 Q. Well, if it's the key programming language, why
13    wouldn't you put it anywhere in the job
14    description as of 2012?
15 A. Because 99.9 percent of the resources available
16    to become programmer/analysts don't know it.
17    It's a skill that I believe people can be
18    trained in.
19 Q. Why did you put Experience with RPG down under
20    Preferred?
21 A. Because RPG is another language that's used in
22    our business systems. There's many more
23    resources that have RPG experience than they
24    have PowerLink experience.
25 Q. You're saying that in the world of programmers,

1    many more of them have experience with RPG as
2    opposed to PowerLink?
3 A. Yes.
4 Q. At least to your knowledge?
5 A. Yes.
6 Q. Were you involved in making the decision that
7    Kathleen Fjerstad would be hired as a contract
8    employee through Omni Resources?
9 A. Yes.
10 Q. Was anybody else involved in that decision?
11 A. I don't know the resources at Omni that were
12    involved in that. At CURT I was the only
13    resource.
14 Q. And did you look through a number — first of
15    all, how did her name come to your attention?
16    Was it a resumé Omni provided to you?
17 A. Yes.
18 Q. And did Omni provide you with a number of
19    different resumés in addition to Ms. Fjerstad
20    before she was hired?
21 A. I'm aware of Pam's. I'm not sure I'm aware of
22    others. So I'm not sure if it's more than one,
23    but certainly one other one.
24 Q. When did Ms. Fjerstad begin working at CURT
25    Manufacturing as a contract employee?

1 A. I don't recall that date. But it was — I
2    believe it was in 2011, early 2011.
3 Q. Was it before Pam Palzkill started?
4 A. Yes.
5 Q. Do you recall approximately how many months
6    before?
7 A. I don't know the exact number of months before.
8 Q. What position was she hired for?
9 A. As a contract programmer?
10 Q. Right.
11 A. Or as an associate at CURT Manufacturing?
12 Q. Good clarification. Let me restate the
13    question for you. When Ms. Fjerstad began
14    working at CURT Manufacturing as a contract
15    employee through Omni Resources, what position
16    was she working in as a contract employee?
17 A. Programmer/analyst.
18 Q. What was she hired to do?
19 A. Write RPG programs and enhance RPG programs.
20 Q. And what type of programs was she hired to
21    write?
22 A. RPG-based programs.
23 Q. I understand that. That's RPG based. But what
24    were the programs going to do?
25 A. Help fix the ball of Band-Aids that our system

1    was where all these patches were on where we
2    had this unstable environment that I referenced
3    earlier.
4 Q. Is that what she primarily did for the first
5    year she was working there?
6 A. For the first year, no.
7 Q. So her role changed at some point?
8 A. Yes, it did.
9 Q. When did it change?
10 A. Sometime during the first year.
11 Q. Why did it change?
12 A. Because she brought to my attention the need to
13    learn other skills, in particular PowerLink.
14    She told me she couldn't do her job unless she
15    knew how to do PowerLink.
16 Q. And you specifically recall her saying that?
17 A. Yes, multiple times.
18 Q. Did she explain why she had said that?
19 A. Because as she was looking at the programs, she
20    learned that she needed to do things in
21    PowerLink. And she knew the objective was to
22    solve that particular problem, and she couldn't
23    solve that problem without learning that skill.
24 Q. Was that news to you?
25 A. It was.

1 Q. You were surprised by that?
2 A. I was.
3 Q. Why is it you hadn't identified that?
4 A. I have earlier experience with MAPICS as a
5    business system and programming in MAPICS. My
6    first job out of college was in an environment
7    where we were running MAPICS 20 years ago, and
8    it was all RPG based. So when I came to CURT
9    Manufacturing, my assumption was it was still
10   all RPG based, and so I was looking for RPG
11   resources. My predecessors that were there
12   were only programming in RPG; they weren't
13   doing anything else. So there was no exposure
14   to this other tool.
15 Q. At the time Ms. Fjerstad told you — allegedly
16   told you that she felt she couldn't do her job
17   unless she was using PowerLink, did you know
18   PowerLink yourself?
19 A. No, I did not.
20 Q. Had you had any exposure to PowerLink?
21 A. No, I had not. Did I — did I know there was
22   PowerLink being used? Yes.
23 Q. Going back to your reference to MAPICS. Is
24   MAPICS considered a programming language?
25 A. MAPICS is an ERP system.

1 Q. What does that mean?
2 A. ERP stands for enterprise resource planning.
3 Q. Because I thought in your testimony several
4    moments ago you had talked about MAPICS or
5    mentioned MAPICS as a programming language, so
6    I must have got that wrong.
7 A. I don't believe I ever said that.
8 Q. And you would agree it's not a programming
9    language; it's an ERP system?
10 A. Correct.
11 Q. When was — well, let me ask it this way. At
12   some point did CURT Manufacturing offer Ms.
13   Fjerstad a job as an employee of CURT
14   Manufacturing rather than working through Omni
15   on a contract basis?
16 A. Yes.
17 Q. When did that occur?
18 A. I don't recall the date.
19 Q. Who made the decision that she was going to be
20   offered a job as an employee?
21 A. I made the decision that I wanted her as an
22   employee. As far as who made the decision that
23   allowed me to hire her, that was probably a
24   combination of myself and HR. And I don't know
25   if it was Bob or Greg, one of the two.

1 Q. You had to get approval from somebody?
2 A. To hire?
3 Q. Yes.
4 A. Absolutely.
5 Q. Why did you want to hire her as an employee
6    rather than continuing on a contract basis?
7 A. The business had requirements that suggested to
8    me that I needed to add resources to my
9    department or continued resources for well over
10   three years.
11 Q. So did you sit down before making the formal
12   offer and talk to Ms. Fjerstad about whether or
13   not she'd be interested in working as an
14   employee rather than on a contract basis?
15 A. I did.
16 Q. Tell me about that discussion.
17 A. I can tell you what I assume we talked about,
18   but I can't tell you the exact discussion.
19 Q. Can you tell me anything generally in terms of
20   what the substance of your discussion was?
21 A. Yeah. That would be that we have a business
22   need to continue to develop in MAPICS, which
23   means PowerLink and RPG. And I know I thanked
24   her many times for helping me understand the
25   business need to use PowerLink because I took

1    the position with her specifically multiple
2    times that I wanted her to just do RPG, and she
3    continued to tell me multiple times she
4    wouldn't be able to do her job if that was the
5    case.
6 Q. Was a written job offer extended to her, if you
7    know?
8 A. I believe it was, yes. And I believe there's a
9    piece of paper somewhere.
10 Q. Did she fill out a job application?
11 A. I believe that's our requirement, yes.
12 Q. Did she fill the job application out after you
13   told her that you wanted to hire her as an
14   employee of CURT rather than on a contract
15   basis through Omni?
16 A. That's highly likely. I don't recall, but
17   that's highly likely.
18 Q. When you say "that's highly likely," why do you
19   say that?
20 A. Just thinking of the chain of events it makes
21   sense to me that that's the approach I would
22   have taken.
23 Q. In other words, see if she's interested, tell
24   her that you're interested; and if she is, then
25   have her fill out the application?

```
1   A.  Yeah.
2   Q.  Is Ms. Fjerstad still working for CURT
3       Manufacturing?
4   A.  No, she's not.
5   Q.  Did she resign?
6   A.  No, she did not.
7   Q.  She was terminated?
8   A.  Yes, she was.
9   Q.  Why was she terminated?
10  A.  I don't know if it's — can I ask him a
11      question?
12  Q.  No, you can't.  He can make an objection if he
13      feels an objection is appropriate.
14  A.  Okay.  Then I don't know if it's appropriate
15      for me to talk about other employees and
16      reasons for exiting or things like that.
17  Q.  Well, again, unless your attorney makes an
18      objection, you have to answer the question.
19          MR. JOHNSON:  Let me just make sure of
20      something.  As long as there's no
21      confidentiality obligations, then I think you
22      have to answer the question.  I don't want you
23      to speculate or talk about — if you have any
24      sort of agreement with her to keep anything
25      confidential, then I think we would need to
```

```
1       talk about that.
2           MR. REINHARDT:  And I would agree with you
3       on that.
4   A.  Okay.  Performance, poor performance.
5   BY MR. REINHARDT:
6   Q.  When Ms. Fjerstad was hired — I'm sorry.  Let
7       me back up because I need to distinguish
8       between the contract basis and employee.  When
9       CURT Manufacturing decided to take Ms. Fjerstad
10      on as a programmer/analyst on a contract basis,
11      how many people were you looking for to be
12      programmer/analysts?  One?  Two?
13  A.  Two.
14  Q.  And how was it you came upon the — why did you
15      conclude that two people were necessary?
16  A.  My past experience suggested that that would be
17      an appropriate number.
18  Q.  And when you were looking at two
19      programmer/analysts, did you have some project
20      task list that you had generated?
21  A.  No, I did not.
22  Q.  Did you have a list anywhere of what you wanted
23      these two people to do?
24  A.  No, I did not.
25  Q.  You just knew you wanted them to do work to
```

```
1       help make the system stable?
2   A.  That's one way of putting it, yes.
3   Q.  How would you put it?
4   A.  I'd put it as we — we had a big ball of
5       Band-Aids, and that was — that was the
6       environment that I inherited when I came to
7       CURT Manufacturing.  Fix after fix, patch after
8       patch was put on our ERP, and it was a very
9       unstable environment.  And the only way to fix
10      that was to peel off one Band-Aid at a time,
11      figure out why that Band-Aid was put on, do the
12      analysis to figure that out, and then eliminate
13      the need for the Band-Aid.  That's the way I
14      described it to everybody.
15  Q.  Now, when Ms. Fjerstad came on as a contract
16      programmer/analyst, were there any other
17      programmer/analysts working in your department
18      at CURT Manufacturing?
19  A.  Yes, there was.
20  Q.  Who were they?
21  A.  In 2011, Jesse Brandenburg I believe was the
22      only person with that position.
23  Q.  I take it at some point in 2011 you received
24      information from Omni Resources about Pam
25      Palzkill?
```

```
1   A.  Yes.
2   Q.  And what specifically did you receive?
3   A.  A resumé.
4   Q.  When you reviewed her resumé, were you
5       interested in her being considered as a
6       contract programmer/analyst?
7   A.  I was excited.
8   Q.  Why were you excited?
9   A.  Because it emphasized MAPICS, it emphasized
10      RPG, and it emphasized warehouse management
11      systems.
12  Q.  So she seemed like a good fit based on the
13      resumé?
14  A.  She did.
15  Q.  Did you interview her?
16  A.  We had a phone interview.
17  Q.  And when you say "we," are you talking about
18      you and Pam or was anyone else involved?
19  A.  Just Pam and myself, I believe.
20  Q.  Did you take notes during that interview?
21  A.  I did not.
22  Q.  How long did the phone interview last for?
23  A.  30 minutes to an hour at most.
24  Q.  What did you discuss during the interview?
25  A.  Her past, why she was looking for a job, and
```

1     her experiences, and her skills, and why she
2     left her prior job.
3 Q. Now, as of the time you had the phone interview
4     with Ms. Palzkill, had Ms. Fjerstad already
5     informed you of her opinion that it was
6     necessary to do work in PowerLink to fix the
7     problems with the system?
8 A. I don't believe so, no.
9 Q. What did Ms. Palzkill tell you in terms of why
10     she had left her prior job?
11 A. That she had a major surgery and needed to take
12     time off.
13 Q. Did she tell you what the major surgery was?
14 A. No, she did not.
15 Q. Did you ask what the major surgery was?
16 A. I was aware of I think it's HIPAA, and because
17     of that, I'm under the impression never ask
18     questions about stuff like that.
19 Q. You've read HIPAA?
20 A. No, I have not.
21 Q. You're making assumptions?
22 A. I was aware of HIPAA.
23 Q. What did she tell you in terms of her past
24     experience?
25 A. That she programmed in RPG, that she programmed

1     in an environment where there was a need to
2     integrate the picking-packing process at Ashley
3     Furniture with MAPICS, and that that was her
4     primary role at Ashley.
5 Q. Did you ask her what languages she was
6     proficient in?
7 A. I don't recall.
8 Q. Did you ask her what languages she had basic
9     skills in?
10 A. I don't recall specifically asking that. It
11     came up in our discussion that she knew RPG.
12 Q. Did you ask her why she had left her — or why
13     she was looking for a job at that time?
14 A. I think she answered that when I asked the
15     original question on why she left her last job,
16     so I don't believe I had the need to ask that.
17 Q. Anything else you can recall discussing with
18     her during that phone interview?
19 A. She — the role at Ashley was one of her being
20     a consultant, the contractor, and that she had
21     been there for 20 years. That's — that's —
22     that was my key take-away there.
23 Q. Was there any discussion during this phone
24     interview about whether or not she would be
25     interested in working as an employee eventually

1     of CURT Manufacturing as opposed to as a
2     contract employee?
3 A. That's likely because I would have started the
4     discussion talking about our environment and
5     changes that were occurring and that I was
6     looking to fill some positions and this was a
7     contract-to-hire position.
8 Q. And do you recall what she said in response to
9     you bringing up that this was a
10     contract-to-hire position?
11 A. No, I don't.
12 Q. When you say it's a contract-to-hire position,
13     please explain what you mean by that.
14 A. That this was a service Omni was providing
15     where they would help us find resources to fill
16     from a staff augmentation perspective. And if
17     that resource worked out for us, we would have
18     the option to hire that person after the term.
19     Was an agreement made between CURT
20     Manufacturing and Omni Resources that Ms.
21     Palzkill would work for CURT as a contract
22     programmer/analyst?
23 A. For six months, yes.
24 Q. So Ms. Fjerstad had already been working with
25     CURT Manufacturing as a contract

1     programmer/analyst at the time Ms. Palzkill
2     came on; correct?
3 A. Yes.
4 Q. And Ms. Palzkill's position at CURT when she
5     started was as a contract programmer/analyst;
6     true?
7 A. That — that's — that was the goal, yes.
8 Q. That was the goal, or that's what happened?
9 A. Do you have a copy of the statement of work for
10     Pam that I can see? If you do, then I can tell
11     you exactly what was in the contract.
12 Q. I don't have that contract.
13 A. Okay.
14 Q. Well, in your mind as head of the department,
15     was she coming on as a programmer/analyst?
16 A. Yes.
17 Q. And how were you intending to use her?
18 A. As a programmer/analyst.
19 Q. For what projects?
20 A. For the MAPICS and for our pick-pack process
21     that's integrated with MAPICS, along with
22     Varsity, our shipping system. Everywhere that
23     we use RPG programming.
24 Q. So as of May of 2011, you have Ms. Fjerstad and
25     Ms. Palzkill on as programmer/analysts, and I

1    can't remember the name of the other.  Is it
2    Jesse Brandenburg?
3  A. Yes.
4  Q. How did you decide who was going to be doing
5     what?
6  A. We had the big ball of Band-Aids, and whichever
7     Band-Aid was most visible, we peeled that off.
8     And then we gave that to a resource to figure
9     out why it was there, to do the analysis, and
10    then do the programming to fix it.
11 Q. Were you the person who assigned tasks to Ms.
12    Palzkill and Ms. Fjerstad?
13 A. Define tasks.
14 Q. Work to be done.
15 A. I'm the person that identified which projects
16    we would work on.  I'm not the person that
17    assigned tasks.
18 Q. Well, you identified what projects needed to be
19    worked on you said; correct?
20 A. Yes.
21 Q. And then somebody had to delegate work to be
22    done on those projects; correct?
23 A. I wouldn't — wouldn't describe it that way to
24    be honest.
25 Q. Let me try it this way.  How did Ms. Fjerstad

1     or Ms. Palzkill know what they were going to be
2     doing on a day-to-day basis?  Did they come up
3     with those ideas themselves, or did somebody
4     tell them?
5  A. The role of the programmer/analyst on the
6     analyst side of things is to help figure things
7     out and to manage themselves, yes.  So they
8     would do that themselves, yes, absolutely.
9  Q. Who was supervising Ms. Palzkill?
10 A. Initially it was a combination of Paul
11    Zwirchitz and myself.
12 Q. Did that change at some point?
13 A. I hired another project manager, and she was
14    added to that.
15 Q. Who was that?
16 A. Erin Klanderman.
17 Q. And so you said initially it was Paul and
18    yourself, then later on after Erin Klanderman
19    was hired, it would have been Paul, Erin
20    Klanderman, and yourself?
21 A. Yes.
22 Q. Is that how it remained throughout the time Ms.
23    Palzkill was working there?
24 A. Yes.
25 Q. And what did you do in terms of — strike that.

1     was one of the ways you supervised Ms. Palzkill
2     by having one-on-one meetings with her?
3  A. One of the ways I supervised her?  I don't
4     believe I supervised her.
5  Q. I thought you — okay.  Let me ask the question
6     again.  Who supervised Ms. Palzkill?
7  A. That would probably be Paul.  Define supervise.
8  Q. Well, define for me what you understand
9     supervise to mean.
10 A. Someone that would provide direction as far as
11    how to do their job.
12 Q. Are you telling me that because of the nature
13    of the position no one supervised her?
14 A. As in how to do their jobs?
15 Q. Yeah.
16 A. From a contractor perspective, that would be my
17    expectation that I'm not going to go in, nor
18    would anybody else in my department, and tell
19    people how to write programs.  We're expecting
20    that skill to exist in that person.
21 Q. Did anyone give Ms. Palzkill direction about
22    what she was supposed to be doing?
23 A. Yes.
24 Q. Who did that?
25 A. Paul Zwirchitz and myself.

1  Q. And then —
2  A. Later on Erin Klanderman, yes.
3  Q. And how did you folks do that in terms of
4     telling her what she should be doing?
5  A. That would have been at the project level where
6     we're peeling off a Band-Aid and we're saying,
7     Here's our problem, go figure out why we need
8     this problem, and write some programs to fix
9     it.
10 Q. Did you have one-on-one meetings with Ms.
11    Palzkill?
12 A. I did, yes.
13 Q. Why did you have those meetings?
14 A. Because I needed to keep current with what was
15    going on in my department.
16 Q. Did you have one-on-one meetings with Ms.
17    Fjerstad?
18 A. Yes.
19 Q. Why did you have those meetings?
20 A. Because I needed to be kept current with what
21    was going on in my department.
22 Q. So it was an informational thing?
23 A. Yes.
24 Q. How often did those meetings occur with Ms.
25    Palzkill?

```
1    A.   Maybe once a month.
2    Q.   Did you schedule them?
3    A.   They were scheduled weekly.
4    Q.   They were scheduled weekly by who? You?
5    A.   Yes.
6    Q.   How would you schedule them?
7    A.   Send a calendar appointment. It's a recurring
8         appointment that occurs every week.
9    Q.   Where did those meetings occur? Strike that.
10        Where were they scheduled to occur?
11   A.   Initially in my office.
12   Q.   What calendar system was she using when she was
13        at CURT Manufacturing? Was it Outlook?
14   A.   Outlook.
15   Q.   And you're saying that it would be scheduled in
16        advance for every week?
17   A.   You schedule one appointment, and you say
18        weekly to set it up to recur, and you set up
19        the frequency of recurrence and the duration of
20        the recurrence.
21   Q.   Was it set for a particular day then?
22   A.   It was.
23   Q.   What day?
24   A.   I don't recall.
25   Q.   What time?
```

```
1    A.   I don't recall.
2    Q.   What location? Your office?
3    A.   My office.
4    Q.   And I take it from your testimony that although
5         you alleged the meetings were scheduled weekly,
6         that they only, in fact, took place monthly?
7    A.   I would say on average we probably met once
8         every four weeks.
9    Q.   And given the fact that you say that you had
10        set them up recurring on a weekly basis, why
11        did they occur on average every month instead
12        of every week?
13   A.   Two reasons. One was my schedule; I couldn't
14        always make it. And the other, Pam just didn't
15        show up.
16   Q.   How many times do you allege she just didn't
17        show up?
18   A.   I'd say it's probably split between my schedule
19        and her not showing up equally.
20   Q.   Did that upset you when she didn't show up?
21   A.   No, it didn't upset me.
22   Q.   Why not?
23   A.   Define upset.
24   Q.   You don't know what upset means, sir? Did it
25        make you angry?
```

```
1    A.   No, it did not make me angry.
2    Q.   Did it cause you any concern?
3    A.   It made me wonder.
4    Q.   Did you say, Pam, why aren't you showing up for
5         these meetings?
6    A.   Yes.
7    Q.   What was her response?
8    A.   She was busy.
9    Q.   And what did you say when she said, I couldn't
10        show up because I was busy?
11   A.   I said okay.
12   Q.   Anything else you said?
13   A.   Nope.
14   Q.   Did she give you advance notice if she wasn't
15        going to be able to show up for a meeting?
16   A.   It might have happened, but not all the time.
17   Q.   And when did this first start to be an issue?
18        Immediately when she started?
19   A.   Yes.
20   Q.   So the first month of her employment you had
21        scheduled these one-on-one meetings for every
22        week, and she only showed up one time?
23   A.   No, no. It was split between my schedule and
24        hers, so her not showing up could have been
25        both.
```

```
1    Q.   So sometimes she would show up, and you
2         wouldn't be there?
3    A.   No. I always let her know.
4    Q.   How did you let her know?
5    A.   I would cancel the appointment.
6    Q.   On the calendar?
7    A.   Or I would tell her. One of the two.
8    Q.   So if we look at the calendar, all of that
9         should be there; correct?
10   A.   Not likely, no.
11   Q.   Why not?
12   A.   When you cancel it, it deletes it. It's not
13        there.
14   Q.   Well, but if you printed off the calendar for a
15        period of time, it should show the scheduled
16        meetings recurring; correct?
17   A.   I'm — I don't believe — I don't believe on my
18        calendar I can go back that far because
19        everything gets deleted after it's old because
20        we don't have enough disc capacity to store
21        everything.
22   Q.   Did you ever tell Ms. Palzkill that, Hey, it's
23        a problem with me — or words to that effect —
24        when we have a meeting scheduled and you don't
25        show up and tell me that you're not going to
```

1      show up?

2  A.   No.

3  Q.   Why not?

4  A.   It wasn't a problem to me.

5  Q.   While Ms. Palzkill was a contract

6      programmer/analyst at CURT Manufacturing, were

7      there periodically scheduled staff meetings in

8      your department?

9  A.   Yes.

10  Q.   Were those regularly scheduled meetings, in

11      other words, on the calendar for a set date and

12      time or were they ad hoc?

13  A.   At that time I think they were regular. I'm

14      not positive, but I think they were.

15  Q.   Weekly?

16  A.   I believe that was, yeah.

17  Q.   Where did those meetings occur?

18  A.   In the Wisconsin Conference Room.

19  Q.   By the way, let me just back up a second

20      because you said initially the one-on-one

21      meetings were scheduled for your office. Did

22      that change at some later date as to where

23      those one-on-one meetings would occur?

24  A.   It did.

25  Q.   When did it change?

1  A.   I don't recall the date.

2  Q.   What was the change?

3  A.   The change was — it changed twice, and I'm not

4      sure if Pam was there when it had changed the

5      second time or not. But the first time it

6      changed from weekly to every other week, and

7      then the second time it changed from every

8      other week to monthly.

9  Q.   Why did you make that change?

10  A.   Because I was becoming too busy. My department

11      was growing, and I didn't have the time to

12      spend with everybody individually that way any

13      longer.

14  Q.   When that happened, when you didn't have the

15      time, how did you keep abreast of what was

16      going on in terms of information?

17  A.   I would rely more on Paul and Erin and the —

18      on the other side of the — the department, the

19      manager there.

20  Q.   And, again, Paul and Erin were project

21      managers?

22  A.   That was their title, yes.

23  Q.   And let me ask this slightly different. I took

24      your testimony to mean that the location of the

25      one-on-one changed from your office to

1      somewhere else. Did the location of the

2      one-on-one meetings with Ms. Palzkill ever

3      change from your office?

4  A.   Yes.

5  Q.   And when did that occur?

6  A.   Well, I said yes, but I don't — I can't

7      address Pam and ask her, but I don't — I

8      don't — I don't recall if Pam was there when I

9      changed it to be monthly or not. If she was

10      there when I changed it to be monthly, that was

11      a lunch meeting.

12  Q.   At a restaurant?

13  A.   To be determined, yes.

14  Q.   And you just don't recall if she was still

15      there when that change was made?

16  A.   I do not. I want to believe she was because I

17      think it was happening that fast, the amount of

18      change that was occurring. So it's highly

19      likely she was.

20  Q.   Were those lunch meetings at a particular

21      restaurant or did it vary?

22  A.   I believe the — I believe it was to be

23      determined.

24  Q.   I understand it was to be determined. But in

25      practice, was the to-be-determined restaurant

1      always the same restaurant, or did you go to

2      different restaurants for one-on-one meetings?

3  A.   Pam and I never met at a restaurant for a

4      meeting.

5  Q.   You did meet with other people at restaurants

6      for one-on-one meetings?

7  A.   Yes.

8  Q.   When you met with those folks at restaurants

9      for one-on-one meetings, was it at the same

10      restaurant or different restaurants?

11  A.   Different restaurants.

12  Q.   And where were those restaurants located?

13  A.   Eau Claire, Wisconsin.

14  Q.   Did you ever have a discussion with Pam about

15      why — did Pam ever express to you that she

16      didn't want to attend one-on-one meetings with

17      you at a restaurant?

18  A.   Now that you ask me that question, I do recall

19      that she was there when I changed this to

20      monthly. And, yes, she did. She asked me if

21      we could just meet at work.

22  Q.   Did she tell you why?

23  A.   No.

24  Q.   Did you ask why?

25  A.   No.

1  Q.  What was your response?
2  A.  Okay.
3  Q.  And is that what occurred then?
4  A.  Nope.
5  Q.  What do you mean?
6  A.  We still never met.
7  Q.  Now, when you had one-on-one meetings with Ms.
8      Palzkill, did you take notes?
9  A.  No.
10 Q.  Did you type anything on your computer to
11     document what was said or what occurred at
12     those meetings?
13 A.  No.
14 Q.  I have seen some documents that are titled
15     Weekly Status Reports. Did Ms. Palzkill while
16     she was working for CURT Manufacturing as a
17     contract-to-hire programmer/analyst fill out
18     weekly status reports?
19 A.  She filled out a report occasionally that was
20     titled Weekly Status Report.
21 Q.  You say "occasionally." What do you mean by
22     that?
23 A.  She did not do it weekly.
24 Q.  How do you know that?
25 A.  Because I read them.

1  Q.  So if she prepared a weekly status report, you
2      would have read it?
3  A.  No. It could have happened where she prepared
4      it and didn't send it.
5  Q.  How did it get to your attention? Was it
6      emailed to your attention?
7  A.  Yes.
8  Q.  So it wasn't hard copied?
9  A.  Correct.
10 Q.  What's the purpose of a weekly status report?
11     Strike that. What was the purpose of a weekly
12     status report as it pertained to Ms. Palzkill?
13 A.  There's three purposes of the weekly status
14     report. One is internal communication to
15     everyone in the department.
16 Q.  Second purpose?
17 A.  I was waiting for you.
18 Q.  Go ahead.
19 A.  The second purpose is communication to me on
20     what they're doing, and the third purpose is to
21     add to the skill for people to be able to break
22     bigger projects into smaller events to manage
23     those events.
24 Q.  Did you say to add to the scale?
25 A.  Skill.

1  Q.  Skill. So who did the status reports go out to
2      when they were prepared by Ms. Palzkill in
3      addition to you? Everyone in the department?
4  A.  Yes.
5  Q.  So it would have been a mass email?
6  A.  Yes.
7  Q.  And was there any room — not any room. But
8      were you able to make comments on the status
9      report?
10 A.  I don't understand the question.
11 Q.  Sure. The weekly status reports came to you
12     occasionally, as you said, prepared by Ms.
13     Palzkill. Were you able to enter any data or
14     comments on the weekly status report that she
15     prepared?
16 A.  Update the document? Is that your question?
17 Q.  Yeah.
18 A.  Did I update their documents?
19 Q.  Yeah.
20 A.  No, I did not.
21 Q.  Were you able to if you were so inclined?
22 A.  I could update the attachment on my email and
23     save it. I could do that, yes. I never did.
24 Q.  Going back to the staff meetings. Forgive me
25     for repeating this question. How often — did

1      you say that was weekly that they occurred?
2  A.  What are we talking about right now? What's
3      weekly?
4  Q.  The staff meetings.
5  A.  Staff meetings. I believe they were, yes. I
6      think they might have changed from weekly to
7      two weeks to monthly also, but at the time I
8      think it was weekly.
9  Q.  And they were in the Wisconsin Conference Room.
10     Is that what you said?
11 A.  I believe that's correct, yes.
12 Q.  Who attended the staff meetings?
13 A.  The IT department.
14 Q.  How many employees were in the IT department at
15     the time Ms. Palzkill was there?
16     Approximately.
17 A.  Approximately 10.
18 Q.  What was the purpose of the staff meetings?
19 A.  That's a good question because I always put it
20     up to the staff. I said, This is your meeting,
21     not my meeting.
22 Q.  Was there an agenda ahead of time?
23 A.  No.
24 Q.  Or minutes taken?
25 A.  No.

1 Q. So you left it up to the staff as to what would
2    be discussed?
3 A. Yes.
4 Q. And in practice I understand that it wasn't —
5    you didn't dictate it, but what type of things
6    were discussed at those meetings?
7 A. Typically everyone present went around and
8    described what they were working on.
9 Q. What other type of things were discussed?
10 A. I would talk about what's going on in the
11    business.
12 Q. What do you mean?
13 A. Our business is a rapidly growing, changing
14    business, and I would give updates to the
15    department that I had.
16 Q. When everyone went around and talked about what
17    they were working on, did Ms. Palzkill share
18    what she was working on?
19 A. Sometimes.
20 Q. Are you saying that there were times that
21    everyone in the room would say what they were
22    working on and Ms. Palzkill would not?
23 A. Yes.
24 Q. How often did that occur?
25 A. At the end, every time. As in the last

1    probably three months.
2 Q. And did you say to Ms. Palzkill, Hey, it would
3    be helpful if you would share what you're
4    working on during the staff meetings?
5 A. I did not.
6 Q. Why not?
7 A. It wasn't my meeting.
8 Q. Did you think it would have been helpful during
9    the last three months for her to share what she
10    was working on during these staff meetings when
11    everyone was doing so?
12 A. Helpful to who?
13 Q. To anybody in the meeting.
14 A. Yes.
15 Q. Did anybody else present at the meetings during
16    the last three months when Ms. Palzkill
17    allegedly didn't state what she was working on
18    say to her in your presence, Hey, why don't you
19    share with us what's going on?
20 A. No.
21 Q. Did you ask her during these three months why
22    she wasn't sharing what was going on with her
23    projects at the staff meetings?
24 A. No.
25 Q. So that was a change during the last three

1    months?
2 A. What — what was a change?
3 Q. Her nonparticipation in the sharing of what was
4    going on.
5 A. That's correct, yes.
6 Q. What did you attribute it to, if anything?
7 A. My assumption — the way you're asking the
8    question you want me to assume, so my
9    assumption is that Pam wanted to be a
10    contractor, and she did not want to be part of
11    this department. She wanted to keep herself
12    separate from the department.
13 Q. Did you ever ask her if that was what was going
14    on?
15 A. No.
16 Q. Did you ever hear Ms. Palzkill complaining at
17    staff meetings?
18 A. Yes.
19 Q. How many times did you hear that?
20 A. I don't recall.
21 Q. What did you hear her saying?
22 A. The theme was always, There's too much, there's
23    not enough standards, there's no structure, I
24    need help.
25 Q. Did you respond to that?

1 A. In my discussions with Pam when I did talk to
2    her about stuff, yeah, I did.
3 Q. What did you say?
4 A. I talked to her about the analyst side of the
5    business need that we had and that she should
6    be able to go in and look at these programs;
7    she shouldn't have to be told what programs,
8    what files to use. That was her job.
9 Q. But the grumblings you heard where she said
10    these things, There's too much, not enough
11    standards, I need help, those were comments she
12    made at staff meetings?
13 A. Grumblings? I'm not sure I understand
14    grumblings.
15 Q. Well, when I — okay. Let's do it this way.
16    The comments that you said she made —
17 A. Um-hum.
18 Q. — that you testified to about a minute ago —
19 A. Yep, yep.
20 Q. — were those comments made at staff meetings?
21 A. Sometimes, yes.
22 Q. Where else were they made?
23 A. When I was talking to her.
24 Q. When the comments were made at staff meetings,
25    I take it it would have been in the presence of

1    all other staff then; true?

2  A.  Yes.

3  Q.  Did you ever hear her say, These assholes won't

4    get off our back?

5  A.  Can you say that again?

6  Q.  Did you ever hear Ms. Palzkill say, These

7    assholes won't get off our back, or words to

8    that effect?

9  A.  I don't recall.

10  Q.  Did anyone ever tell you that she said that?

11  A.  I don't recall.

12  Q.  Did you ever hear Ms. Palzkill say that she

13    wasn't happy working at CURT Manufacturing?

14  A.  No.

15        MR. JOHNSON:  Would now be a good time for

16    a break?

17        MR. REINHARDT:  Yeah.  Let's take a

18    five-minute break.

19        (A break was taken.)

20  BY MR. REINHARDT:

21  Q.  During any of the conversations that you had

22    with Ms. Fjerstad about PowerLink, was Ms.

23    Palzkill present?

24  A.  I believe she was, yes.  As in the area.

25  Q.  Was she a participant in any of those

1    conversations?

2  A.  No.

3  Q.  Did you ever make a comment at a staff meeting

4    or at staff meetings that you wanted RPG

5    programmers only to be programming in RPG?

6  A.  I don't believe I said that in a staff meeting,

7    but I did say that to Kathy.

8  Q.  And that would be the conversation that you

9    previously testified about?

10  A.  When Kathy talked to me about using — having

11    the need to know PowerLink, yes.  And then I

12    believe Pam was in the area of, yes.

13  Q.  And it's your feeling — well, not your

14    feelings.  Basically you're telling us that Ms.

15    Fjerstad convinced you that PowerLink was

16    essential to be a program — to have knowledge

17    of that was essential to be a

18    programmer/analyst at CURT Manufacturing; is

19    that true?

20  A.  She was part of that effort, yes, of convincing

21    me, yes.

22  Q.  Who else was part of that effort?

23  A.  Infor is the name of the company that owns

24    MAPICS.

25  Q.  Infor as in information without the "mation"?

1  A.  The name of the company is Infor, I-N-F-O-R.

2  Q.  And who at Infor was part of convincing you

3    that PowerLink was important?

4  A.  There was a couple of presentations that I saw

5    at conferences where they presented, They're no

6    longer developing in RPG, they're only

7    developing in PowerLink.

8  Q.  Does CURT Manufacturing currently have anyone,

9    any programmer/analysts, who are doing RPG

10    work?

11  A.  Yes.

12  Q.  Back to my question.  Are you telling us that

13    the presentations put on by Infor were

14    important in your decision that PowerLink was

15    an essential part of programming at CURT

16    Manufacturing?  Let me rephrase the question.

17    I was trying to get the identity of any

18    individuals at Infor who would have told you,

19    Hey, it's important to use PowerLink.  Were

20    there individuals at Infor that told you that,

21    or was it based upon presentations that Infor

22    made?

23  A.  There was a presentation, I raised my hand, I

24    asked the question of what types of resources

25    they were hiring, and the answer was PowerLink.

1    They were not hiring — the person made the

2    statement, They were no longer hiring RPG

3    programmers.

4  Q.  Why was that important to you in your decision?

5  A.  Because MAPICS is our business system that — I

6    have a vision that isn't going away.  It will

7    be there for a very long time, and I need to be

8    able to support that business system.  So if

9    the owners of that system are no longer

10    developing in RPG, that's just — the skill set

11    needed to support it is no longer just going to

12    be RPG.

13  Q.  Was training in PowerLink provided to any

14    programmer/analysts at CURT Manufacturing in

15    2011?

16  A.  Yes.

17  Q.  Were you responsible in 2011 for putting

18    together a budget for your department?

19  A.  Yes.

20  Q.  Did you have to build in ahead of time; that

21    is, at the time of doing the budget, if you

22    were going to have training that was an expense

23    for programmer/analysts?

24  A.  Training was part of the budget.  I'm not sure

25    if — training was part of my budget, yes.

1 Q. In other words, if you're in 2011, you're
2 working off a budget that would have been
3 prepared in late 2010, early 2011; correct?
4 A. Yes.
5 Q. And as part of preparing that budget, did you
6 have to identify specifically what training
7 would be provided?
8 A. No.
9 Q. Was that identified in the 2011 budget, what
10 training specifically was going to be provided?
11 A. I don't believe so, no.
12 Q. What about 2012?
13 A. I don't believe so, no.
14 Q. In any event, who made the decision in 2011
15 that training would be provided to
16 programmer/analysts in PowerLink?
17 A. I did.
18 Q. And when in the year 2011 did you make that
19 decision? If you can't recall a month, if you
20 could tell me a season.
21 A. Specific to your question regarding
22 programmer/analysts, Jesse I believe went in
23 the early — early winter of 2011.
24 Q. And by early winter, do you —
25 A. Like January, February time frame. I don't

1 remember when the class was. I'm sorry. But
2 Jesse went with a couple other resources that
3 weren't programmer/analysts.
4 Q. So this would have been before Ms. Fjerstad had
5 convinced you that PowerLink was essential?
6 A. Yes.
7 Q. So why were you sending Jesse in January or
8 February of 2011 if you hadn't had that
9 discussion with Ms. Fjerstad yet?
10 A. At the time I believed that the roles would be
11 separate.
12 Q. What do you mean?
13 A. That the skills didn't cross paths. I was
14 still basing it off my 20 years of experience
15 earlier that MAPICS was an RPG system.
16 Q. What type of work was Jesse doing at CLRT
17 Manufacturing in January and February of 2011?
18 A. He was a programmer/analyst helping support RPG
19 and PowerLink programs. In addition, he had a
20 tool he supported called Formtastic.
21 Q. Which is what?
22 A. It's a — when you create an invoice, the
23 document that prints from the ERP system is a
24 very basic-looking document. Formtastic takes
25 that basic-looking document as input and makes

1 it look pretty. In addition to that, he worked
2 with labels and created labels.
3 Q. So Jesse you believe went in January or
4 February or 2011 to PowerLink training. Where
5 was that training?
6 A. Oconomowoc, Wisconsin.
7 Q. Who was it put on by?
8 A. ISE is the name of the company.
9 Q. How many days was it?
10 A. I think there was a three-day and a two-day,
11 combined five-day, or it's three-day and
12 one-day, maybe. I think it's four days total.
13 Q. When is the next time in 2011 that anyone from
14 your department went to PowerLink training?
15 A. Another group I believe it was May, June time
16 frame.
17 Q. Was Ms. Palzkill working —
18 A. August. Sorry. I think it was August.
19 Q. And was Ms. Palzkill working at CLRT
20 Manufacturing as a contract-for-hire
21 programmer/analyst at the time the second group
22 went?
23 A. Yes.
24 Q. Who was in the second group?
25 A. I know Kathy Fjerstad was, and I'm not sure who

1 else.
2 Q. Now, how is it that the training was arranged
3 for the second group? Did you send out
4 something indicating to people that they were
5 able to go, or how was it communicated to
6 people that they were — that the option was
7 there?
8 A. I talked to them personally.
9 Q. So you talked to Ms. Fjerstad personally?
10 A. Yes.
11 Q. What did you tell her?
12 A. That there was a training class in PowerLink,
13 and I wanted her to attend it.
14 Q. Who else did you talk to?
15 A. Pam.
16 Q. You personally talked to Pam about attending
17 PowerLink training in Oconomowoc; is that
18 correct?
19 A. Multiple times.
20 Q. When was the first time?
21 A. It would have been in August.
22 Q. When was the second time?
23 A. The next class — I don't know exact dates. I
24 think — I think that's information that we
25 provided, what would have been the timing of

1    the next class.
2 Q. How many times did you speak personally with
3    Pam about her attending PowerLink training?
4 A. Three times.
5 Q. Was anybody else present on any of those three
6    occasions?
7 A. Present as in the area?  Yes.
8 Q. Who?
9 A. Would have been other people that were sitting
10   in the area at that time.
11 Q. Who?
12 A. But I don't know who specifically it was at
13   that time, but I know people were.  We were in
14   tight quarters.
15 Q. So the first time that you talked to Pam about
16   PowerLink training what specifically did you
17   say to her?
18 A. I talked to her about knowledge, skills, and
19   talent, which is a common theme that I talk to
20   all my resources about.  knowledge being
21   something you learn over the time of your job,
22   skills being something you're trained on, and
23   talent being something you're born with.  And
24   at CURT Manufacturing we needed resources with
25   multiple skills, and I often referred to skills

1    as being wearing multiple hats.  I talked to
2    Pam about the need to wear multiple hats.
3 Q. So what did you say to her about PowerLink
4   training?
5 A. That the way this department was growing and
6   going there was going to be a need for the
7   programmer/analyst to know PowerLink, and I
8   wanted to send her to PowerLink training.
9 Q. You specifically told her that you wanted to
10   send her to PowerLink training?
11 A. Yes, multiple times.
12 Q. What did she say in response?
13 A. I only want to be an RPG programmer.
14 Q. Is that a verbatim response?
15 A. Yes, multiple times.
16 Q. So each time you allegedly told her that you
17   wanted to send her to PowerLink training, her
18   response was the same, I only want to be an RPG
19   programmer?
20 A. Yes, multiple times.
21 Q. My question was each time that you said that to
22   her, her response was the same; true?
23 A. Yes.
24 Q. And did you ever take notes after these
25   conversations?

1 A. No.
2 Q. Did you ever share with anybody else in
3   management that you had offered to send Pam to
4   PowerLink, and she had refused?
5 A. No.
6 Q. Kept that to yourself?
7 A. Yes.
8 Q. Do you have any documents, such as emails,
9   correspondence, or anything else in writing,
10   indicating that you offered to Ms. Palzkill
11   that she could attend PowerLink training?
12 A. No.
13 Q. Did you ask Ms. Palzkill while she was a
14   contract-for-hire employee at CURT
15   Manufacturing whether or not she had the
16   ability, the base knowledge, to work in
17   PowerLink?
18 A. No.
19 Q. To your knowledge, did Ms. Palzkill do any work
20   on her own to learn PowerLink?
21 A. At her deposition she pointed out that she did
22   do one thing.
23 Q. Did you know about that?
24 A. It was on her status report.  I didn't recall
25   it to be honest with you.

1 Q. You've since looked back at a status report
2   that references her doing some work in
3   PowerLink?
4 A. At the deposition, yes.
5 Q. In 2011 and 2012 what fringe benefits were
6   available to employees of CURT Manufacturing in
7   the IT department?
8 A. Fringe benefits as in health care?  Is that the
9   type of thing you're talking about?
10 Q. That's what a fringe benefit is generally
11   referred to as, yes.  Is health care available?
12 A. Health care is, yes.
13 Q. Was there any type of retirement plan?
14 A. There's a 401k plan.
15 Q. And in 2011 and 2012 did CURT Manufacturing
16   match any percentage of employees'
17   contributions?
18 A. I think there was — there is a match, yes.
19 Q. What amount is the match?  Strike that.  What
20   amount was the match back then, if you know?
21 A. I think it's six percent up to — so you
22   contributed six percent, and then the company
23   50 cents I think of that.
24 Q. 50 cents up to the six percent?
25 A. Up to the six percent, yes.

1  Q.  Any other benefits that you can think of?  Life
2      insurance?  Disability insurance?  Anything
3      like that?
4  A.  There's — there's — Aflac is an option where
5      you can subscribe to stuff yourself.  I think
6      there's a — there's a — there's a workout
7      facility thing.  If you attend a workout
8      facility, you get five dollars or something
9      like that.
10 Q.  Now, did you during 2011/2012 have meetings
11     with project managers in the department on a
12     regular basis?
13 A.  Yes.
14 Q.  Were those weekly meetings?  Monthly meetings?
15 A.  I don't think at that time we had them
16     regularly, regular scheduled like that, but
17     maybe we did.  I don't recall.
18 Q.  Let me ask it this way then.
19 A.  We met often.
20 Q.  Did you have discussions with any of the
21     project managers at CURT Manufacturing about
22     your or their assessment of Pam Palzkill's
23     performance as a contract-for-hire
24     programmer/analyst?
25 A.  To those specific words, no.  If I can

1      elaborate, I will.
2  Q.  Please elaborate.
3  A.  We had — we had discussions on the design of
4      the department and whether or not skills
5      existed for that design of the department,
6      individuals.
7  Q.  Let me — and we'll get — I appreciate that
8      clarification.  Let me ask it this way.  The
9      way I envisioned it is you're in charge of this
10     department, you have these contract-for-hire
11     people, and you'd be asking the project
12     managers, Hey, how is Pam doing, is she doing
13     good, bad, what are her strengths, weaknesses?
14     Did you have those type of discussions with the
15     project managers who had worked with Pam?
16 A.  Yes.
17 Q.  What did they tell you?
18 A.  I'm trying to recall specific discussions, and
19     I don't recall specific discussions.
20 Q.  If you can't recall specific discussions,
21     that's okay.  What I'm trying to get at is
22     generally what thoughts did they convey to you.
23 A.  That progress was slow, that there was
24     reluctance to do the analysis side of things.
25     Those are probably the two.

1  Q.  Who told you that?  Paul?
2  A.  Erin and Paul.
3  Q.  Anybody else?
4  A.  No.
5  Q.  And what was your — strike that.  In terms of
6      progress was slow, what did you understand that
7      to mean?  Progress on what?
8  A.  The projects that were provided to her,
9      obtaining results.
10 Q.  And what objective measures or metrics were
11     used to determine whether or not progress was
12     slow or adequate or fast?
13 A.  Past experiences.
14 Q.  What does that mean?
15 A.  That would be the knowledge — part of
16     knowledge, talent, and skills.  So the
17     knowledge you've gained by programming over
18     time.
19 Q.  So, in other words, your understanding of
20     progress is slow was here's what it took
21     somebody else to do something like this, and
22     here's how long it's taking Pam, and she's
23     taking longer than it should.  Is that what
24     you're telling me?
25 A.  That contributes to it.

1  Q.  I'm just trying to get a sense of when you
2      understood that progress was too slow, how do
3      you determine if progress was slow, adequate,
4      or otherwise.  One thing you've mentioned to me
5      is you did that based on past experience.  Are
6      there any other metrics or measurable ways that
7      you're able to tell whether or not Pam's
8      progress was slow, adequate, or quick?
9  A.  Yes.
10 Q.  What?
11 A.  When the project starts, you ask the resource
12     you're assigning that to, How long do you think
13     it's going to take?
14 Q.  And I take it from your answer that on occasion
15     Pam would say, I think it will take this long,
16     and it took longer than that?
17 A.  Yes.
18 Q.  Did you ever ask her why it took longer than
19     she had originally anticipated?
20 A.  Yes.
21 Q.  What did she say?
22 A.  That there's a lot of files to try to figure
23     out what to do, and she needed someone to tell
24     her what files were needed.
25 Q.  Did you communicate with Ms. Palzkill by email

1    while she worked at CURT Manufacturing as a
2    contract-for-hire programmer/analyst?
3  A.  Emails were exchanged and provided to you guys,
4    every email.
5  Q.  Sure. I understand that. So you did
6    communicate with her by email?
7  A.  I don't know that I would call the emails that
8    were exchanged communication, but the emails
9    were sent back and forth, yes.
10  Q.  Let me ask you this then. Why would you on
11    some occasions talk to her in person and on
12    other occasions send her emails?
13  A.  Yeah, I guess you're right. Email — I'm not a
14    fan of email as being a form of communication
15    personally, so I usually try to avoid it. But
16    I did communicate via email.
17  Q.  Your preference in your position at CURT
18    Manufacturing was to communicate with employees
19    in your department or contract-for-hire people
20    in your department in person; is that correct?
21  A.  Yes.
22  Q.  But on occasion you would use emails?
23  A.  Yes.
24  Q.  At some point did you decide that Ms. Palzkill
25    would not be a good fit for becoming an

Q & A COURT REPORTERS, INC.
(715) 834-9812

1    employee of CURT Manufacturing?
2  A.  Yes.
3  Q.  When?
4  A.  The exact date I don't know. I'll throw out
5    that it was around October of 2011.
6  Q.  You can say the fall of 2011?
7  A.  Could I say that?
8  Q.  Yeah.
9  A.  Sure.
10  Q.  And was there a particular event or occurrence
11    that led you to conclude in October of 2011
12    that Ms. Palzkill would not be a good fit to
13    hire?
14  A.  Yes.
15  Q.  What occurred?
16  A.  It was a discussion that I was having with her
17    about wearing multiple hats and the need for
18    her to learn PowerLink and her comment that she
19    only wanted to be an RPG programmer, and my
20    response, That's okay from a contractor
21    perspective, but the design of the department
22    is suggesting I need programmer/analysts that
23    know PowerLink. So as long as there's a need
24    for RPG — dedicated RPG programming, I'd be
25    able to keep her on as a contractor.

Q & A COURT REPORTERS, INC.
(715) 834-9812

1  Q.  That would have been the second or third
2    conversation you allegedly had about PowerLink
3    with her?
4  A.  That would have been the second.
5  Q.  And that's when in your mind it was clear you
6    weren't going to hire her; correct?
7  A.  Everything was pointing to that direction
8    unless she changed her position on only being
9    an RPG programmer.
10  Q.  Did you contact Omni Resources in September or
11    October of 2011 to ask about when Pam Palzkill
12    would be available to be hired as an employee?
13  A.  That sounds about the right time frame, yes.
14  Q.  Why would you have done that if you had already
15    made your mind up that she wasn't a good fit?
16  A.  I believe that was before. You said — what
17    were the months you just said?
18  Q.  September or October.
19  A.  Okay. That was before.
20  Q.  Okay.
21  A.  And I would do that because I was exploring all
22    the options available to me for my department
23    as we were growing.
24  Q.  Did you have any discussions with Ms. Palzkill
25    prior to October of 2011 about her becoming an

Q & A COURT REPORTERS, INC.
(715) 834-9812

1    employee, being hired as an employee?
2  A.  I believe it started the first time during the
3    phone interview. I think I've already
4    testified to that.
5  Q.  You've testified to that. Let's go forward
6    from that. What was the next conversation you
7    had with her about becoming an employee?
8  A.  I'd say late summer, early fall. I might be
9    wrong.
10  Q.  Tell me about that conversation.
11  A.  It was geared towards if there's a need for a
12    dedicated programmer/analyst because she had
13    already told me she only wanted to be — I'm
14    sorry — dedicated RPG programmer, she had
15    already told me that. If there was that need,
16    would she be interested.
17  Q.  What did she say?
18  A.  Yes. And that's what led me to contact Omni.
19  Q.  When Ms. Palzkill allegedly told you, I only
20    want to be an RPG programmer, in response to
21    your saying, We're looking for somebody with
22    multiple skills, did you ask her why?
23  A.  Yes.
24  Q.  What did she say in response?
25  A.  That's what I want.

Q & A COURT REPORTERS, INC.
(715) 834-9812

1 Q. Did she tell you or explain why that's what she
2     wanted?
3 A. No.
4 Q. Did you have a need for an RPG dedicated
5     programmer in 2012?
6 A. No.
7 Q. When did Ms. Palzkill disclose that she had MS?
8 A. During one of the meetings I was having with
9     her on talking to her about if there's a need
10     for a dedicated RPG programmer would she be
11     interested.
12 Q. Do you recall what month that was?
13 A. You know, it's in my notes. If you can show me
14     what those notes are —
15 Q. I'm not going to show you your notes.
16 A. — I can tell you exactly then.
17 Q. If you don't know without looking at documents,
18     tell me that.
19 A. I don't know without looking at the document.
20 Q. Tell me about the conversation. What did she
21     say to you?
22 A. What did she say to me?
23 Q. How did the topic come up?
24 A. I was exploring options, and that's what I told
25     her, that I'm still exploring where we're going

1     with this department, and I wanted to keep her
2     current. She was there under the impression
3     she was going to be hired.
4 Q. Why do you say that?
5 A. Because it was revealed to her during the phone
6     screen. I already testified to that.
7 Q. So how did the — what did she say about MS?
8 A. So I was talking to her about it, she said she
9     was interested, and I don't know if it was that
10     time or the next time we talked about it, one
11     of two, she said, I want you to know that I
12     have MS.
13 Q. Anything else she said about her MS?
14 A. No.
15 Q. What did you say?
16 A. That — I said okay, and I paused for a little
17     bit trying to figure out why did somebody just
18     tell me this, why did a contractor just tell me
19     this.
20 Q. Did you ask her then?
21 A. So I asked her, I said, Why — why are you
22     telling me this?
23 Q. What did she say?
24 A. She said, I don't want there to be any
25     surprises.

1 Q. What did you say?
2 A. I said okay. I thought about it some more, and
3     I said, Well, this isn't a concern of mine.
4 Q. Did you tell her that you would have to talk to
5     anybody else in management about it?
6 A. About MS?
7 Q. Yeah.
8 A. No, I did not.
9 Q. Did you talk to anybody else in management
10     about her MS?
11 A. Did I —
12 Q. Did you talk to Kim Myers about the fact she
13     had disclosed that — strike that. Let me
14     start over. Did you talk to Kim Myers about
15     the fact that Ms. Palzkill had disclosed to you
16     that she had MS?
17 A. Did I tell Kim Myers that in a conversation?
18 Q. Yeah.
19 A. Yes, I did.
20 Q. When?
21 A. After.
22 Q. Why?
23 A. Why? Because I'm aware of HIPAA. I haven't
24     read HIPAA. I'm aware of HIPAA. And when any
25     health issue comes up with someone, I go to HR,

1     and I say, HR, what do I do about this because
2     I'm not an expert. I don't know the laws.
3 Q. So what did you tell Ms. Myers?
4 A. I told her that one of the options I'm pursuing
5     is having — having Pam as a contractor because
6     this was after the fact. You skipped a part
7     here. So this is after Pam said she wanted to
8     be a contractor. And during that discussion, I
9     said, You know, I want you to be aware this
10     happened, and I don't know what to do about
11     that from a HIPAA perspective.
12 Q. What did she say?
13 A. I don't remember her exact words, but I recall
14     that I left thinking, There's nothing to do,
15     that she brought it up, and there's nothing to
16     do about it.
17 Q. Did you talk to Robert — is it Roemer or
18     Ra-mer?
19 A. Bob Roemer.
20 Q. Did you talk to Rob Roemer about the fact that
21     Ms. Palzkill had disclosed MS to you?
22 A. Never.
23 Q. Did you ever talk to Ms. Palzkill and tell her
24     that you had talked to Ms. Myers and
25     Mr. Roemer, and they had told you that her MS

1 would be a problem or a concern?

2 A. No.

3 Q. You deny that?

4 A. Absolutely.

5 Q. Now, you indicated that — did you —

6 subsequent to the conversation where Ms.

7 Palzkill disclosed her MS, did you ever talk to

8 her about MS again? Did the topic ever come up

9 in any other conversations?

10 A. I don't know if it was that or a different one,

11 but we had a conversation about my own past

12 experience with MS.

13 Q. That your sister has MS?

14 A. Yes.

15 Q. And what was discussed in that regard?

16 A. That she's had it for 30 years and within the

17 past year has gone back to working full time.

18 That's about it, I guess.

19 Q. Now, did you have a conversation with Ms.

20 Palzkill in which she stated that she wanted to

21 be a — to remain a contractor rather than

22 become an employee?

23 A. Yes.

24 Q. Was that just you and Ms. Palzkill present?

25 A. Yes.

1 Q. Take any notes during that conversation?

2 A. No.

3 Q. How did the topic come up?

4 A. I'm exploring options for my department, and in

5 the back of my mind I keep thinking, She was a

6 contractor for 20 years at Ashley. Why is

7 that? And I asked her that.

8 Q. What did she say?

9 A. I asked her if MS was the reason she was a

10 contractor at Ashley, and she replied, Yes.

11 Q. And during that conversation then did she say,

12 I would prefer to be a contractor here at CLRT

13 rather than an employee?

14 A. Yes.

15 Q. What specific words did she use?

16 A. I don't recall.

17 Q. And do you recall approximately when that

18 conversation occurred? It was before you

19 talked to Ms. Myers; right?

20 A. It was. I think that was the initial — I

21 think that was still part of the initial

22 discussion when she revealed to me she had MS.

23 And I asked her, Why are you telling me this

24 now, and, No surprises, and then I started

25 thinking, Okay, 20 years at Ashley, is that why

1 you were a contractor at Ashley.

2 Q. So you believe —

3 A. And then I asked her, Is this an insurance

4 thing?

5 MR. JOHNSON: Just answer the questions.

6 BY MR. REINHARDT:

7 Q. So the discussion regarding her being a

8 contractor at Ashley and it relating to MS was

9 during the conversation which she disclosed to

10 you for the first time that she had MS; is that

11 correct?

12 A. At this time that's what I believe, yeah.

13 Q. And you also believe that during that same

14 conversation you asked, Is this an insurance

15 thing; is that correct?

16 A. I believe that to be true, yes.

17 Q. And what did she say in response?

18 A. She said, No, I have insurance.

19 Q. What else do you recall being discussed during

20 that conversation?

21 A. Other than reminding her that I'm exploring

22 options for the department and where we're

23 going and that this is in the — in the need of

24 us determining that there's a need for a

25 full-time RPG programmer, that there wasn't a

1 position being defined yet for that, that was

2 it.

3 Q. But as of this conversation we're talking

4 about, you understood that she didn't want to

5 be an employee, she wanted to be a contractor?

6 A. She told me that was her preference.

7 Q. Did you ever make an offer to Ms. Palzkill to

8 become an employee of CLRT Manufacturing?

9 A. No.

10 Q. Did you ever make an offer to Ms. Palzkill for

11 her to remain as a contractor outside of CLRT's

12 contract with Omni Resources?

13 A. No.

14 Q. Why did CLRT Manufacturing continue to use her

15 as a contract programmer/analyst in 2012?

16 A. We still had a business need for a dedicated

17 RPG programmer at that time.

18 Q. When did that business need end?

19 A. The plan that we saw at the beginning of the

20 year was that we wouldn't have that dedicated

21 need around May.

22 Q. And why didn't you have that dedicated need

23 around May? What had changed?

24 A. The big ball of Band-Aids that — the big ball

25 of Band-Aids that we were working on, we had

1    peeled off enough Band-Aids from the RFG
2    perspective where we were starting to do more
3    development in PowerLink and less in RFG.
4  Q.  Did you ever contact anybody at Omni in the
5    fall of 2011 to ask about Ms. Palzkill's MS?
6  A.  No.
7  Q.  Other than Ms. Myers and Mr. Roemer, who we
8    talked about, did you talk to anybody else at
9    CURT Manufacturing about Ms. Palzkill's
10    disclosure regarding MS?
11  A.  No. And I didn't talk to Bob Roemer either.
12  Q.  Why wasn't Ms. Palzkill offered a job as an
13    employee of CURT Manufacturing?
14  A.  She didn't meet the needs of the business
15    requirements.
16  Q.  Because?
17  A.  She only wanted to program in RFG, and I wanted
18    someone — I needed someone that could program
19    and wanted to program in both RFG, PowerLink,
20    SQL, CL, do other things, wear other hats.
21  Q.  Did you know whether or not she could program
22    in SQL?
23  A.  It was on her resumé.
24  Q.  What?
25  A.  It was on her resumé.

1  Q.  So are you saying that one of the reasons you
2    didn't hire her is because she didn't want to
3    program in SQL?
4  A.  No.
5  Q.  What about CL?
6  A.  What's the question?
7  Q.  Is one of the reasons that you did not hire her
8    is because you believe she didn't want to
9    program in CL?
10  A.  No.
11  Q.  Is the reason you didn't hire her because you
12    believe she didn't want to program in
13    PowerLink?
14  A.  Correct. PowerLink was our business need going
15    forward.
16  Q.  When did CURT Manufacturing start looking for
17    — strike that. In 2012 did CURT Manufacturing
18    start looking for another programmer/analyst in
19    your department?
20  A.  Yes.
21  Q.  When in 2012?
22  A.  It would have been March, April time frame.
23  Q.  Why in 2012 did you start looking for another
24    programmer/analyst?
25  A.  That's when we firmed up the design of the

1    department and resources that we were going to
2    be needing.
3  Q.  How did you do that? Did you have a business
4    plan in writing?
5  A.  No.
6  Q.  So how did you firm up the design?
7  A.  I met multiple times with Paul and Erin.
8  Q.  Did you put the firm up of the design in
9    writing?
10  A.  No.
11  Q.  Have any emails regarding the firm up of the
12    design?
13  A.  No.
14  Q.  This was all verbal?
15  A.  Yes.
16  Q.  So in order to get another programmer/analyst,
17    what actions were taken by you or at your
18    direction? Were there postings in the same
19    places that there had been in 2011?
20  A.  Yes.
21  Q.  And did CURT Manufacturing end up hiring
22    Angie — what's her name?
23  A.  Kundinger.
24  Q.  Thank you. Kundinger?
25  A.  Um-hum.

1  Q.  Yes?
2  A.  Yes.
3  Q.  Did you get a job application from Angie
4    Kundinger?
5  A.  Yes.
6  Q.  Did you get a resumé from her?
7  A.  Yes.
8      MR. REINHARDT: Off the record.
9      (A discussion was held off the record.)
10  BY MR. REINHARDT:
11  Q.  What was Angie Kundinger hired as? As a
12    programmer or as a programmer/analyst?
13  A.  Programmer/analyst.
14  Q.  And did she have any skills in RFG programming?
15  A.  None.
16  Q.  Was she provided training in RFG?
17  A.  Yes.
18  Q.  Why?
19  A.  Because that was one of the skills she was
20    going to need.
21  Q.  Why was she going to need that skill?
22  A.  Because our big ball of Band-Aids, our ERP
23    system, RFG is one of the many skills that are
24    needed.
25  Q.  Did Ms. Kundinger know PowerLink?

**Page 97**

1  A.  Nope.
2  Q.  Was she provided with training in PowerLink?
3  A.  Yes.
4  Q.  Who trained her on RPG?
5  A.  A set of discs called ATS.
6  Q.  To your knowledge, did Ms. Palzkill provide any
7      training to Ms. Kundinger in RPG?
8  A.  Not to my knowledge.
9  Q.  To your knowledge, did she perform any
10     knowledge transfer as to RPG?
11 A.  Not to my knowledge.  She was only there three
12     days.
13 Q.  Who was only there three days?
14 A.  Pam and Angie.
15 Q.  There was an overlap of three days?
16 A.  Yeah.
17 Q.  When was Mr. — is it Mr. —
18 A.  It's a handful of days.  Sorry.  I don't know
19     the number of days.  It was only a few days.
20 Q.  When was Mr. Zimfel hired?  Do I have that name
21     right?
22 A.  Zim-pel.
23 Q.  Zim-pel?
24 A.  P-E-L.  Z-I-M-P-E-L.
25 Q.  When was he hired?

Q & A COURT REPORTERS, INC.
(715) 834-9812

**Page 98**

1  A.  I believe August 2011.
2  Q.  Was he hired as a programmer/analyst?
3  A.  Yes.
4  Q.  And he was hired as an employee rather than
5      somebody you got through Omni Resources; true?
6  A.  Yes.
7  Q.  And did he have PowerLink background?
8  A.  Nope.
9  Q.  He was provided training on PowerLink?
10 A.  Yes.
11 Q.  Did he have RPG background?
12 A.  Nope.
13 Q.  Was he provided training in RPG?
14 A.  Yes.
15 Q.  And what training was provided to him?
16 A.  The same CDs.
17 Q.  Were there CDs or discs available for training
18     on PowerLink?
19 A.  No.
20 Q.  Did the decision with respect to hiring Ms.
21     Kundinger, was that your decision or somebody
22     else's decision?
23 A.  The ultimate decision to hire is always a
24     combination of HR and myself.
25 Q.  You have to get approval to hire; correct?

Q & A COURT REPORTERS, INC.
(715) 834-9812

**Page 99**

1  A.  Yes.
2  Q.  But somebody makes the decision about whether
3      or not this is the person we want; correct?
4  A.  Yes.
5  Q.  Was that you?
6  A.  That was a combination of Paul, Erin, and
7      myself.
8  Q.  And that was —
9  A.  Ultimately, though, it was me.
10 Q.  That was true with respect to both Ms.
11     Kundinger and Mr. Zimpel?
12 A.  No.  Erin wasn't there when we hired Tom.
13 Q.  Got it.  Did CURT Manufacturing's budget have
14     anything to do with your decision that Ms.
15     Palzkill was not a good fit to be hired by
16     CURT?
17 A.  No.
18 Q.  Was Ms. Palzkill — did you have conversations
19     with Ms. Palzkill about what rate of pay she
20     would charge as a contractor?
21 A.  Yes.
22 Q.  How many times did you have that discussion?
23 A.  I recall two.
24 Q.  And what did she tell you?
25 A.  The first one she gave me a rate, and I believe

Q & A COURT REPORTERS, INC.
(715) 834-9812

**Page 100**

1      it was the rate she used to charge Ashley.  And
2      the second one she gave me a new rate, and the
3      new rate was higher.
4  Q.  And how did that come up the first time?
5  A.  When we were talking about her being a
6      contractor and I'm exploring options for my
7      department.
8  Q.  In other words, when she allegedly told you,
9      I'd rather be a contractor than an employee?
10 A.  Yes.
11 Q.  And you're saying the second time she quoted
12     you a higher rate?
13 A.  Yes.
14 Q.  Did you ask her why?
15 A.  Yes.
16 Q.  What did she say?
17 A.  She said Omni was paying her benefits.
18 Q.  That's what she told you?
19 A.  Yes.
20      (Exhibit No. 6 was marked for
21      identification.)
22 BY MR. REINHARDT:
23 Q.  Showing you what's been marked for
24     identification as Deposition Exhibit No. 6.
25     I'd ask that you look at the middle entry on

Q & A COURT REPORTERS, INC.
(715) 834-9812

1    the first page. First of all, what was your
2    email at CURT Manufacturing in 2011?
3  A. Thau@curtmfg.com.
4  Q. Who was Tom Brey?
5  A. He's the account rep at Omni that I worked
6    with.
7  Q. Was he your primary contact at Omni?
8  A. Yes.
9  Q. Is the middle entry dated Friday, October 28th,
10    2011, at 8:07 a.m., something you sent to
11    Mr. Brey?
12  A. Yes.
13  Q. In here you wrote, I am just confirming the
14    date that Pam will be available for us. Why on
15    October 28th did you want to know what day Pam
16    would be available for you?
17  A. I'm exploring options in my department.
18  Q. So at least as of October 28th of 2011 you were
19    still open to the option of hiring Ms. Palzkill
20    as an employee?
21  A. I was exploring options, and if there was going
22    to be a need for a dedicated RFG programmer,
23    that was one of the options.
24       (Exhibit No. 7 was marked for
25    identification.)

1  BY MR. REINHARDT:
2  Q. Showing you what's been marked for
3    identification as Hau Deposition Exhibit No. 7.
4    Is this an email — the top entry. I'm sorry.
5    Is the top entry from Mr. Brey to you on
6    October 28th, 2011?
7  A. Yes.
8  Q. And who was Andrew?
9  A. He was a contractor that we had hired through
10    Omni.
11  Q. A contractor for what position?
12  A. For IT supervisor I believe it was.
13       (Exhibit No. 8 was marked for
14    identification.)
15  BY MR. REINHARDT:
16  Q. Showing you what's been marked for
17    identification as Hau Deposition Exhibit No. 8.
18    The second entry on this page dated — from you
19    to Mr. Brey dated November 1st, 2011, states,
20    we are under a new budget review process that
21    has all changes to our current environment on
22    hold. At this time, I'm hoping to continue to
23    contract Pam via Omni Resources.
24       Why did you talk about Pam and Omni
25    Resources — well, why did you talk about

1    contracting Pam or continuing to contract her
2    in the same context or in the same paragraph as
3    talking about the budget review process? How
4    were those two things related in your mind, if
5    at all?
6  A. I believe that the six months were coming due,
7    and Tom was going to be looking for some
8    feedback from me on whether or not we were
9    going to hire her or not. So I gave him the
10    reason why. At that time that was — that
11    was — that was one of them.
12  Q. So as of November 1st of 2011 one of the
13    reasons that you weren't going to hire Pam
14    because of the budget?
15  A. I wasn't going to hire Pam at that time for a
16    number of reasons. One was she only wanted to
17    be an RFG programmer. I hadn't determined if I
18    had a full-time need for an RFG programmer or
19    not. I didn't put all that into a paragraph to
20    Tom. I just said, We're under a contract —
21    we're under a budget review, and that was my
22    reasoning.
23  Q. I'm not following you. What did your budget
24    review have anything to do with Pam? That's
25    what I'm asking.

1  A. None.
2  Q. So why did you put that in there?
3  A. It felt good.
4  Q. What do you mean by that?
5  A. I wanted to give Tom a reason why I wanted to
6    extend Pam.
7  Q. You had the option as of November of not paying
8    the contract rate to Omni and just contracting
9    directly with Pam; right? Six months was up;
10    right?
11  A. I don't know. Was it? Is that the date?
12  Q. It was May of 2011 to November of 2011.
13  A. Okay.
14  Q. Regardless of the dates, why wouldn't you — if
15    you understood that she just wanted to be a
16    contractor, why wouldn't you just contract
17    directly with her and save the money that you
18    had been paying to Omni?
19  A. I don't know. It's a good question. Thought
20    hadn't crossed my mind.
21  Q. Didn't cross your mind at all?
22  A. No.
23       (Exhibit No. 9 was marked for
24    identification.)
25  BY MR. REINHARDT:

1  Q.  Showing you what's been marked for
2      identification as Deposition Exhibit No. 9.  Is
3      this an email Mr. Brey sent to you on
4      November 21st of 2011?
5  A.  Yes.
6  Q.  Does this reflect that you wanted them to
7      backdate the books, that is Omni, to show
8      Andrew had started on a different date?
9  A.  No.
10 Q.  What were you asking him to do in terms of the
11     September 1st question?
12 A.  I don't know what the September 1st question
13     was.
14 Q.  You don't recall at this time; is that right?
15 A.  I don't know what the September 1st question
16     was.
17         (Exhibit No. 10 was marked for
18     identification.)
19 BY MR. REINHARDT:
20 Q.  Showing you what's been marked for
21     identification as Deposition Exhibit No. 10.
22     Can you tell me what this document is?
23 A.  This was the notes I was asking for earlier.
24 Q.  Is this a document that you prepared?
25 A.  It is.

1  Q.  When did you prepare it?
2  A.  The day that I was informed we were being sued.
3  Q.  What, if anything, did you use to prepare it
4      other than your memory?
5  A.  The emails that contained status reports.
6  Q.  Anything else?
7  A.  That's what comes to mind.
8  Q.  And why I'm asking this is I'm trying to
9      determine if there were any notes or other
10     documents other than perhaps emails or weekly
11     status reports that you used to prepare your
12     descriptive — your descriptions regarding
13     months of in this document.
14         MR. JOHNSON:  Objection.  Asked and
15     answered.
16         MR. REINHARDT:  Go ahead.  He's made an
17     objection for the record, but you need to
18     answer the question.
19         MR. JOHNSON:  You can go ahead and answer.
20 A.  Nothing else.
21 BY MR. REINHARDT:
22 Q.  Why do you say in here on a number of different
23     entries, Pam has a warm smile?
24 A.  Because I liked Pam.  She does have a warm
25     smile.

1  Q.  How is that relevant to your response here?
2      Let me ask it another way.  What was the
3      purpose in preparing this document?
4  A.  We were being sued.
5  Q.  So what was the purpose in preparing the
6      document?
7  A.  To get my thoughts, as much as I could recall
8      them, on paper.
9  Q.  You wanted to put down things that you thought
10     were relevant to the defense of the suit; is
11     that correct?
12 A.  I wanted to put down thoughts that were
13     relevant to my experience in working with Pam.
14     I don't know what's relevant or not.
15 Q.  So how did you decide what you were going to
16     put in here and what you weren't going to put
17     in here as to your monthly recitations of
18     events?
19         MR. JOHNSON:  Asked and answered.  Go
20     ahead.
21 A.  I wanted to put down my thoughts that were my
22     experience in working with Pam.
23 BY MR. REINHARDT:
24 Q.  Did you consult with anybody when you were
25     preparing this document in terms of getting

1      other individuals' recollections of events?
2  A.  No.
3  Q.  Did you prepare this document all in one day?
4  A.  I believe I did, yeah.
5  Q.  How long did it take you to prepare this
6      document?
7  A.  I don't know.  An hour, two.
8  Q.  Did anybody ask you to prepare this document?
9  A.  No.
10 Q.  What did you do with this document when it was
11     prepared?
12 A.  I gave it to Mark.
13 Q.  Did you give it to Ms. Myers?
14 A.  Yeah.
15 Q.  On the last page under — there's a section
16     titled General Notes.  Do you see that?
17 A.  Yes.
18 Q.  You write under the second point, Pam has never
19     filled out an application for employment, nor
20     has she been requested to.  Why did you put
21     that under General Notes?
22 A.  It was one of the thoughts I had.  I was being
23     sued for not hiring her.
24 Q.  But from your perspective, she had told you she
25     didn't want to be hired; true?

```
1   A.  True.
2   Q.  She told you she wanted to be a contractor?
3   A.  Yeah.
4   Q.  So this must have shocked you?
5   A.  Absolutely.  Absolutely.
6   Q.  So did you think to yourself, Why the heck is
7       she doing this?
8   A.  I thought to myself, How could I be so wrong.
9   Q.  What do you mean by that?
10  A.  I liked Pam.  Last thing I expected from her.
11      There was never any discussion with her, that
12      she had with me regarding this, never.
13  Q.  Regarding what?
14  A.  My not hiring her because she has MS, the
15      reason for the lawsuit.
16  Q.  The second point says, I was required to
17      discuss her interest in CLRT to let Omni
18      Resources (her employer) know about them.  How
19      were you required or by what were you required
20      to discuss her interest in CLRT?
21  A.  I'm sorry.  Where are you?
22  Q.  The third item under General Notes, second
23      sentence.  You write, I was required to discuss
24      her interest in CLRT.  Why do you say you were
25      required to do that?
```

```
1   A.  That's part of the contract.  I can't — I
2       can't go to a contractor and talk to them about
3       hiring them without going to the firm that they
4       work for first.
5   Q.  Within the first six months?
6   A.  Within the first six months.
7   Q.  Is it your understanding that even after the
8       first six months of Ms. Palzkill being at CLRT
9       Manufacturing as a contractor for hire, you
10      still have to go to Omni Resources to talk to
11      them about hiring her?
12  A.  With the contract that I had?
13  Q.  Yeah.
14  A.  Yes.
15  Q.  If you look at Month of March 2012, there is
16      the second entry from the bottom.  I'm sorry.
17      April of 2012, second entry from the bottom.
18      You there?
19  A.  Yep.
20  Q.  Discussed Pam's current productivity with the
21      two project managers, and all three of us
22      concluded that she was not performing at the
23      level she used to.  Was it your feeling that
24      she initially performed at a high level of
25      productivity, but that declined?
```

```
1   A.  No.
2   Q.  What do you mean when you stated, She was not
3       performing at the level she used to?
4   A.  Attitude.
5   Q.  What do you mean by that?
6   A.  Her attitude changed.
7   Q.  When did it change?
8   A.  I don't know.
9   Q.  How did it change?
10  A.  It became more harsh and disruptive.
11  Q.  We haven't talked about that.  How was her
12      attitude harsh and disruptive?
13  A.  Difficult to talk to, difficult to work with.
14      Not with me, with other resources.
15  Q.  Who told you that she was difficult to work
16      with?
17  A.  Erin and Paul.
18  Q.  What did they tell you?
19  A.  They told me that — I don't recall the exact
20      words.
21  Q.  Who told you that she was difficult to work
22      with?
23  A.  Erin and Paul.
24  Q.  What did they tell you?
25  A.  I don't recall other than she was difficult to
```

```
1       work with.  I don't recall the words.
2   Q.  Why did you keep her on as a contract employee
3       through Omni Resources paying a really high
4       rate of pay if she became harsh and disruptive?
5   A.  I had a business need for an RPG programmer at
6       that time.
7   Q.  Well, you had a business need for a dedicated
8       RPG programmer at that time?
9   A.  I did.  That's all she was doing.
10  Q.  So despite the fact that these folks allegedly
11      reported to you that she was harsh and
12      disruptive, you felt the business needs
13      dictated keeping her on?
14  A.  Yes.
15  Q.  Did you ever talk to Pam Palzkill and say, Hey,
16      you're being harsh and disruptive?
17  A.  No.
18  Q.  Why not?
19  A.  I asked Erin and Paul to.
20  Q.  What did you ask them to do?
21  A.  Talk to Pam about being harsh and disruptive.
22  Q.  Did they, to your knowledge?
23  A.  Don't know.
24  Q.  Did they ever follow up with you?
25  A.  I don't know.
```

1 Q. Did you ever follow up with them?
2 A. No.
3 Q. Any other ways her attitude changed?
4 A. During our meetings sitting at a table, she
5 wasn't sitting at the table.
6 Q. You're talking about —
7 A. The department meetings, yes.
8 Q. Did you call them staff meetings or department
9 meetings?
10 A. Just now I called it a department meeting.
11 Q. Yeah. And I'm just trying to get whatever
12 terminology you used back in 2011 or 2012.
13 A. I would usually call it department meetings.
14 Q. All right. Then we'll use department. In the
15 department meetings you said they were in the
16 Wisconsin Room; right?
17 A. Yes.
18 Q. There's a conference table in there?
19 A. Yes.
20 Q. Where did she sit?
21 A. Behind everybody else.
22 Q. Well, was there room at the table?
23 A. Yes.
24 Q. Did you ever ask her, Hey, why are you sitting
25 behind everyone else?

1 A. No.
2 Q. Did it bother you?
3 A. No.
4 Q. When did she start sitting behind everyone
5 else?
6 A. I don't know when she started. I think I
7 noticed during the winter of that — that
8 2000 — what year are we in here now? 2011, I
9 guess.
10 Q. When you say winter, you mean November,
11 December?
12 A. No. January, February type of a time frame.
13 Q. So it would have been January or February of
14 2012?
15 A. Okay.
16 Q. Right?
17 A. Okay. Yeah.
18 Q. Did anyone bring up — bring that topic up to
19 you? Did anybody in management or any staff
20 say, Hey, this is kind of strange, Pam is
21 sitting behind everyone at the table?
22 A. No.
23 Q. Any other ways you believe or contend her
24 attitude changed?
25 A. No.

1 (Exhibit No. 11 was marked for
2 identification.)
3 BY MR. REINHARDT:
4 Q. Showing you what's been marked for
5 identification as Hau Deposition Exhibit No.
6 11. I'd ask that you take a look at the first
7 three pages, which are marked at the bottom or
8 Bates stamped 7 through 11. I'm sorry. 7
9 through 10. Have you seen those first three
10 pages before?
11 MR. JOHNSON: Just for the record, I don't
12 see the Bates stamps at the bottom.
13 MR. REINHARDT: Did I give you the wrong
14 document? You know, maybe I did. Yeah, I gave
15 you the wrong document. You're correct.
16 MR. JOHNSON: Okay.
17 BY MR. REINHARDT:
18 Q. Exhibit 11 is a letter dated August 7th, 2012,
19 from Mark Johnson of Krukowski & Costello to
20 Marian Drew at the EEOC. Have you seen this
21 document before?
22 A. I don't recall.
23 Q. Is this a document that you reviewed prior to
24 your deposition today?
25 A. No.

1 (Exhibit No. 12 was marked for
2 identification.)
3 BY MR. REINHARDT:
4 Q. Showing you what's been marked for
5 identification as Deposition Exhibit No. 12,
6 and you can look. I don't have an extra one.
7 We're done with that document unless — have
8 you seen Exhibit 12 before, the first three
9 pages, which were marked 7 through 10?
10 A. I don't recall.
11 (Exhibit No. 13 was marked for
12 identification.)
13 BY MR. REINHARDT:
14 Q. Showing you what's been marked for
15 identification as Deposition Exhibit No. 13.
16 Please look at page 14 of this document. Does
17 your signature appear on page 14 of this
18 document?
19 A. Yes, it does.
20 Q. And did you review these answers to
21 interrogatories before signing them?
22 A. Yes.
23 Q. Is the content of the interrogatory answers
24 true and correct to the best of your knowledge?
25 A. Yes.

1      (Exhibit No. 14 was marked for
2      identification.)
3  BY MR. REINHARDT:
4  Q.   Showing you what's been marked for
5      identification as Deposition Exhibit No. 14.
6      Can you tell me what this document is?
7  A.   This looks like my budget spreadsheet.
8  Q.   This would be the operating budget you prepared
9      for your department for 2012; true?
10 A.   It appears to be that, yes.
11 Q.   And there's a Training section on this
12     spreadsheet; is that correct?
13 A.   Yes.
14 Q.   And under Training there's specific line items
15     for the type of training that is going to be
16     provided to specific individuals; is that
17     correct?
18 A.   Yes.
19 Q.   Is that what you also did in 2011 or not?
20 A.   I don't recall.
21 Q.   What is — what is Robot?
22 A.   Robot is a tool that we used to use to help
23     schedule programs to run at specific times on
24     our AS/400.
25 Q.   And did you ever talk to Ms. Palzkill about

1      doing work in Robot?
2  A.   I did multiple times.
3  Q.   And what did you say to her?
4  A.   That she needs to be able to wear multiple hats
5      and have multiple skills at the company because
6      we have limited resources, and I wanted her to
7      go to training for Robot.
8  Q.   So you also offered her to go to training in
9      Robot in addition to PowerLink; is that
10     correct?
11 A.   Yes.
12 Q.   And when did you — were those conversations
13     all in 2011, or did you continue to have them
14     in 2012?
15 A.   Those conversations about additional training?
16 Q.   About Robot.
17 A.   Robot was in 2011.
18 Q.   And what did she say when you asked her to go
19     to training in Robot?
20 A.   She didn't want to go.
21 Q.   Do you know if she had skills in Robot?
22 A.   I know she knew how to use Robot.
23 Q.   How did you know that?
24 A.   Because we had Robot, and she was able to
25     schedule a job in Robot. That was not the

1      skills that were needed, though.
2  Q.   What was needed?
3  A.   More advanced skills in exploring how to use
4      the tool beyond how we were currently using it.
5  Q.   But she declined to do that?
6  A.   She did.
7       MR. REINHARDT: Let's take a five-minute
8      break, and then we'll finish up.
9       (A break was taken.)
10 BY MR. REINHARDT:
11 Q.   Who is Kris Roberts?
12 A.   Kris Roberts is — I think her title is VI
13     analyst and works for me in the IT department.
14 Q.   Did Kris Roberts work with Ms. Palzkill at all?
15 A.   I believe they had a lot of conversations
16     together, yes.
17 Q.   And was her role with respect to Ms. Palzkill's
18     work different than the role of the project
19     managers?
20 A.   She didn't have a role with respect to Pam.
21 Q.   Fair enough. Did Kris Roberts give you any
22     feedback about Ms. Palzkill's performance?
23 A.   No.
24 Q.   Didn't say anything to you one way or another?
25 A.   No.

1  Q.   Did Ms. Palzkill's actual physical location of
2      her office at CURT Manufacturing change at some
3      point?
4  A.   Yes.
5  Q.   When?
6  A.   I think it might have changed a couple of times
7      as we reorganized first on the first floor,
8      then eventually we moved upstairs to the second
9      floor.
10 Q.   Did you ever notice her having any difficulty
11     walking upstairs?
12 A.   No.
13 Q.   Where was your office in 2011?
14 A.   Right outside of where Pam was.
15 Q.   What about when you became the CIO? Did that
16     change?
17 A.   It did.
18 Q.   Where did your office end up at that point?
19 A.   Upstairs. So everybody in IT moved upstairs.
20     I moved upstairs also.
21 Q.   Were you around in the actual department on a
22     day-to-day basis as much after you became the
23     CIO?
24 A.   Due to the location of my office, no.
25 Q.   Then I'm missing you. When you were CIO, I

1    thought everyone was on the second floor and
2    you were there also.
3  A.  I was.  Different location on the second floor.
4  Q.  But weren't you away from the department more
5    when you were the CIO?  Aside from the physical
6    location, didn't your duties take you away from
7    day to day being in the department as much?
8  A.  I don't believe so, no.
9       MR. REINHARDT:  Those are all the
10    questions I have.
11      MR. JOHNSON:  I just have a couple.
12  BY MR. JOHNSON:
13  Q.  Mr. Hau, you testified earlier about a
14    discussion you had with Ms. Myers in which you
15    mentioned that Ms. Palzkill told you she had
16    MS.  Do you remember that?
17  A.  Yes.
18  Q.  Was that discussion — what was the purpose of
19    that discussion in which this came up?
20  A.  The purpose was to meet with my boss and Kim
21    and talk about the design of the department and
22    where I was planning on taking it.
23  Q.  So were other employees besides Ms. Palzkill
24    discussed during this meeting?
25  A.  Yes.

1  Q.  And when you said your boss, who was that?
2  A.  Greg Hooks.
3  Q.  So he was present during this meeting?
4  A.  Yes.
5      MR. JOHNSON:  I have nothing further.
6      MR. REINHARDT:  Okay.
7      (Proceedings concluded at approximately
8    11:45 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  STATE OF WISCONSIN  )
2  COUNTY OF DUNN    )ss
3
4      I, Stephanie Peil, Notary Public in and for the
5    State of Wisconsin, certify there came before me the
6    deponent herein, namely Timothy Hau, who
7    was by me duly sworn to testify to the truth and
8    nothing but the truth concerning the matters in this
9    cause.
10     I further certify that the foregoing transcript
11    is a true and correct transcript of my original
12    stenographic notes.
13     I further certify that I am neither attorney or
14    counsel for, nor related to or employed by any of
15    the parties to the action in which this deposition
16    is taken; furthermore, that I am not a relative or
17    employee of any attorney or counsel employed by the
18    parties hereto or financially interested in the
19    action.
20     IN WITNESS WHEREOF, I have unto set my hand and
21    affixed my Notarial Seal this 26th day of November,
22    2013.
23
24
25    Stephanie J. Peil, Notary Public
      My commission expires 2/16/2014

Stephanie J. Peil
Notary Public
State of Wisconsin